# Illinois Official Reports

## Supreme Court

---

### In re D.L.H., 2015 IL 117341

---

Caption in Supreme
Court:
*In re* D.L.H., JR., a Minor (The People of the State of Illinois, Appellant, v. D.L.H., Jr., Appellee).

Docket No.
117341

Filed
May 21, 2015

Decision Under
Review
Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of St. Clair County, the Hon. Walter C. Brandon, Judge, presiding.

Judgment
Affirmed in part and reversed in part.
Cause remanded.

Counsel on
Appeal
Lisa Madigan, Attorney General, of Springfield, and Brendan Kelly, State's Attorney, of Belleville (Carolyn E. Shapiro, Solicitor General, and Michael M. Glick and Brian McLeish, Assistant Attorneys General, of Chicago, and Patrick Delfino, Stephen E. Norris and Jennifer Camden, of the Office of the State's Attorneys Appellate Prosecutor, of Mt. Vernon, of counsel), for the People.

Bill T. Walker, of Granite City, and James E. Parrot, of St. Louis, Missouri, for appellee.

Justices

JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Garman and Justices Thomas, Kilbride, and Karmeier concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion, joined by Justice Freeman.

**OPINION**

¶ 1        On August 28, 2012, the State filed a petition for adjudication of wardship in St. Clair County alleging that respondent, D.L.H., Jr., had committed first degree murder (720 ILCS 5/9-1(a)(2) (West 2012)). At the time, respondent was just 9 years old, and the victim was 14 months old. The circuit court found respondent unfit to stand trial, and in a subsequent discharge hearing found respondent "not not guilty" of murder. The trial court remanded respondent to the Department of Human Services (DHS) for fitness restoration education, so that respondent may become fit and ultimately be tried for murder.

¶ 2        On appeal, respondent argued, in relevant part, that the circuit court erred in denying his suppression motion and, as a result, statements he made to police were improperly admitted at his discharge hearing. The appellate court agreed with respondent and reversed and remanded for further proceedings. 2013 IL App (5th) 130341-U. We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. July 1, 2013).

¶ 3        For the reasons that follow, we affirm in part and reverse in part the judgment of the appellate court, and remand to that court for further review.

¶ 4                                     BACKGROUND

¶ 5        At the time of the events giving rise to the State's petition, respondent lived in Cahokia, Illinois, with his father, David H., Sr., and David's girlfriend, Melissa W.[1] Also residing with David and Melissa were Daveon, their 9-month-old son, and Drequon (Dre), Melissa's 11-year-old son. The family had moved to Illinois in May 2012 from the St. Louis, Missouri, area. In addition to David, Melissa and the three children, the Cahokia household included Melissa's cousin, Alisha J., and Alisha's three sons: 3-year-old Todd, 2-year-old Tymerian, and the 14-month-old victim, T.W.

¶ 6        According to evidence received at the discharge hearing, in the early morning hours of August 23, 2012, emergency services were summoned to the Cahokia residence. Thereafter, T.W. was admitted to Cardinal Glennon Children's Hospital in St. Louis, Missouri, where he died on August 26, 2012, after being removed from life support. The cause of death was "closed head injury." Two days later, the State filed its petition for adjudication of wardship. According to the petition, respondent "repeatedly struck T.W. *** about the head, knowing such acts created a strong probability of death or great bodily harm."

¶ 7        The trial court appointed counsel for respondent and ordered a psychological evaluation of respondent to determine his fitness for trial. See 705 ILCS 405/5-505(1)(j) (West 2012); 725

_____

[1]Respondent's mother died when he was three years old.

ILCS 5/104-11(a) (West 2012). That evaluation was performed on August 31, 2012, by Dr. Daniel Cuneo, a clinical psychologist. Dr. Cuneo's written report states that respondent was "functioning in the Borderline Mentally Retarded Range of Intelligence," with a full scale IQ of 78. Respondent scored extremely low on a test measuring his general range of information. For example, respondent "did not know how many days were in a week or how many hours were in a day. Nor did he know how many things were in a dozen." Respondent was in the bottom 5% of the nation intellectually. Dr. Cuneo's report also noted that respondent's memory, both short term and long term, was impaired.

¶ 8        Dr. Cuneo opined that respondent was unfit for trial, and even if provided with a course of inpatient psychiatric treatment, "there [was] not a substantial probability that he would be able to attain fitness in one year." Dr. Cuneo explained:

"[Respondent]'s age and subsequent cognitive and developmental immaturity coupled with his Borderline Intellectual Functioning substantially impair his ability to understand the nature and purpose of the proceedings and his ability to assist in his own defense. [Respondent] is only nine years old. His cognitive abilities are only at the seven to eight year old level. His thinking is very concrete. He could not grasp the adversarial roles in the court even after I broke them down into simpler term[s]. He kept insisting his 'daddy would help him in court' and could not understand the role of a defense attorney. He could not comprehend that there would be a state's attorney who would attempt to convict him. Due to his age and limited intellectual abilities he could not meaningfully cooperate with his attorney, much less assist in his own defense. He could not grasp how a person was found innocent or guilty."

¶ 9        Dr. Cuneo also diagnosed respondent as suffering from dysthymic disorder (depression) and stated that respondent would benefit from inpatient psychiatric hospitalization and possibly antidepressant medication. Dr. Cuneo noted that records from the Missouri Department of Social Services, Children's Division (Children's Division), disclosed that three hotline calls had been made by respondent's teachers in 2011 and 2012 after respondent arrived at school with suspicious injuries (scratches on his face, bruises on his right forearm, and a bruised cheek and small cut on his lip). Dr. Cuneo quoted the Missouri report: "Children's Division is unsure exactly what it [*sic*] going on that is causing [respondent] to have these suspicious injuries, but it seems that [respondent] is the target child." The Children's Division's report also noted that Melissa would discipline respondent by hitting him with a belt. Dr. Cuneo stated in his report:

"It is uncertain how much of [respondent's] anger and depression stems from his mother's death, his possible scapegoating at home as the Missouri Children's Division speculated, the possible domestic violence in the home, or his possible physical abuse at home as suggested by the three incidents that led the Missouri[ ] Children's Division to refer this family [for services]. These issues could best be addressed in an inpatient setting."

¶ 10       At the fitness hearing conducted in October 2012, Dr. Cuneo testified consistent with his written report, and explained what the term "scapegoating" means:

"What it means to me, is that many times in the family there's an individual that is the victim, that that's the individual that everybody is—that all the difficulties are blamed for.

- 3 -

And in this particular case, this was the individual who had repeated incidents that were called in to the hotline. And while no specific one ever—there was always excuses for each one, but because of the numbers and the weight and the lack of concern after the calls to the school, the Children's Division indicated for abuse/neglect. And their—their reasoning behind that was that this may be the child that is scapegoated in this family, the one that everything is blamed on."

¶ 11        As to a timetable for restoring respondent to fitness, Dr. Cuneo testified that as respondent gets older and his brain changes, he will have better abstract thinking. Dr. Cuneo concluded that it is very possible that respondent could be restored to fitness in five years. No other witness testified. The trial court found respondent unfit to stand trial and no reasonable probability that respondent would attain fitness within one year. See 725 ILCS 5/104-16(d) (West 2012).

¶ 12        On November 15, 2012, the trial court considered various pending motions. The trial court first granted respondent's motion for appointment of a guardian *ad litem*. That appointment was prompted in part by the arrest of respondent's father for child endangerment in connection with the events leading to the death of T.W. The trial court also granted the State's motion to remand respondent to the DHS so that he could be evaluated for fitness restoration services. The trial court further ordered the State to contact the Department of Children and Family Services (DCFS), explaining that:

> "It does appear that this minor is dependent at this point in time, so I'm ordering the State to hotline this case. And I am not going to detain this minor [at the St. Clair County Detention Center]. I'm going to get the department involved ASAP so we can get somebody out here to take care—custody of this young minor."

Respondent was subsequently placed with an aunt, a licensed foster care provider, in Cahokia.

¶ 13        The evaluation conducted by the DHS recommended that respondent be placed with Streamwood Behavioral Healthcare System (Streamwood). Respondent was admitted to Streamwood on December 4, 2012. Pursuant to the trial court's order, Streamwood evaluated respondent for possible commitment under the Mental Health and Developmental Disabilities Code. See 725 ILCS 5/104-23(b)(3) (West 2012). Streamwood found no evidence that respondent was a danger to himself or others, and concluded that respondent did not meet the criteria for civil commitment. In light of these developments, the trial court returned respondent to his aunt, with the condition that he would have no unsupervised contact with other children. The trial court ordered respondent's counsel to provide the court with an outpatient fitness restoration plan, as well as a mental health services and school programming plan.[2]

¶ 14        The trial court also granted the State's motion for a discharge hearing. See 725 ILCS 5/104-23(b)(1), 104-25 (West 2012). The procedures governing discharge hearings are set forth in the Code of Criminal Procedure of 1963, but are incorporated into the Juvenile Court Act of 1987 and are applicable to respondent. See *In re S.B.*, 2012 IL 112204, ¶ 21. The

---

[2]Events following the filing of the State's petition for adjudication of wardship effectively precluded respondent from attending classes for the school year beginning in the fall of 2012. A program addressing fitness restoration, mental health services, and schooling was developed through Chestnut Mental Health Services and approved by the court in January 2013.

purpose of a discharge hearing, which is conducted without a jury, is to determine the sufficiency of the evidence against a defendant who has been found unfit to stand trial. 725 ILCS 5/104-25(a) (West 2012). If the evidence fails to establish the defendant's guilt beyond a reasonable doubt, the court shall enter a judgment of acquittal. 725 ILCS 5/104-25(b) (West 2012). If the evidence is sufficient to establish the defendant's guilt, no conviction results. Instead, the defendant is found "*not* not guilty" (emphasis in original) (*S.B.*, 2012 IL 112204, ¶ 5) and may be remanded for further treatment (725 ILCS 5/104-25(d) (West 2012)). In the case of first degree murder, "the treatment period may be extended up to a maximum treatment period of 5 years." 725 ILCS 5/104-25(d)(2) (West 2012).

¶ 15    Prior to the discharge hearing in the instant case, respondent filed a motion to suppress all statements he made to "anyone" during the investigation of T.W.'s injuries. In his amended motion, respondent focused solely on statements he made to Detective Sean Adams of the Cahokia police department on August 24 and 26, 2012. Respondent argued that the questioning by Detective Adams amounted to a custodial interrogation, at which he did not have the benefit of counsel, and that he did not voluntarily waive his *Miranda* rights. Respondent further argued that, in any event, his statements were not voluntary.

¶ 16    The hearing on respondent's amended suppression motion proceeded on March 14, 2013. The State called as its only witness Detective Adams. He testified that during the course of his investigation, respondent became a suspect. Although Adams stated that he is a trained juvenile officer, he had concerns about interviewing a nine-year-old. Adams explained that he was used to interviewing adults and that it was very unusual to interview someone of respondent's age. The first interview of respondent took place on August 24, 2012, at about 6:30 p.m., in the kitchen of respondent's home. Respondent's father was present. Adams wore his service revolver, but was not in uniform. Although Adams did not consider respondent to be in custody, he provided *Miranda* warnings "to solve any problems." Adams stated that "[w]hichever way you look at it," custodial or noncustodial, respondent received the warnings. Adams further testified that he believed respondent understood his *Miranda* rights by shaking his head up and down, and explaining back to him what a particular right meant. Adams stated that at no time during the interview did respondent or his father indicate that they did not want to speak with him.

¶ 17    The second interview took place on August 26, 2012, at the same place and time. Adams testified that at the time of the second interview, he had not yet been advised of T.W.'s death. Respondent's father was also present for the second interview, but Adams asked him to sit away from the table where respondent was seated. Adams explained that he wanted to clarify a few questions with respondent directly, "instead of having dad interject anything during the interview," or interfere with his questioning of respondent. Adams testified that even though respondent was not in custody, he went over respondent's *Miranda* rights, but not as extensively as during the first interview. Adams believed respondent understood his rights because he shook his head up and down and acknowledged his understanding by saying, "Yes."

¶ 18    Although Adams testified on direct examination that he was "trying to be as honest and sincere" as he could be during the second interview, he admitted on cross-examination that he lied to respondent and employed trick tactics. Adams agreed that he repeatedly told respondent that the injuries to T.W. were an accident, even though Adams did not believe that was the

case. Adams further testified that respondent did not appear to have any sort of developmental delay, and when he asked respondent's father if respondent had any special needs, the father only noted an asthma condition. Adams indicated that had he known about respondent's intellectual limitations, he "would have done it different."

¶ 19    At the suppression hearing, the State played video recordings of the two interviews. Those recordings, which were entered into evidence, disclose that the interviews lasted between 30 and 40 minutes. The details of the two interviews will be discussed later in this opinion.

¶ 20    On March 25, 2013, the trial court denied respondent's suppression motion. The trial court determined that respondent was not in custody at the time of the police questioning, he voluntarily waived his *Miranda* rights, and his statements were voluntary.

¶ 21    The discharge hearing, previously scheduled for March 27, 2013, was continued on the guardian *ad litem*'s motion to have Dr. Cuneo examine respondent as to his sanity at the time of the offense. See 720 ILCS 5/6-2 (West 2012). Dr. Cuneo examined respondent on May 6, 2013. He opined that respondent was legally sane at the time of the offense, notwithstanding his borderline intellectual functioning and depression, even if he did suffer from posttraumatic stress disorder as reported by Chestnut Mental Health Services.[3]

¶ 22    The discharge hearing proceeded on May 22 and 23, 2013. The State called several witnesses. Tara Welch, a physical therapist assistant, testified that she saw T.W. and his mother at their home on August 22, 2012, in the early afternoon. This was Welch's first appointment with T.W., who had previously been evaluated for physical therapy because he was developmentally delayed. T.W. was dressed only in a diaper. Welch testified that he appeared "happy," and she observed no injuries.

¶ 23    Edna Norman, a child protection specialist with DCFS, testified that on August 23, 2012, she and Anna James, the primary investigator, went to the Cahokia home where T.W. resided in response to two hotline reports. The purpose of their visit was to assess the children's safety. Present at that time were Melissa, Dre, Daveon, and respondent, as well as Alisha, Todd and Tymerian. Norman first interviewed respondent in his bedroom. No one else was present for the interview. Respondent, who appeared shy, told Norman that he and T.W. were in the playroom, and that no adults were home. T.W. was crying, and respondent hit him in the forehead. Respondent demonstrated by hitting his fist into his hand. When Norman told respondent that T.W. had a bruise above his eye, respondent said he hit T.W. in the forehead, again hitting his fist into his hand. When Norman asked respondent if he hit T.W. anywhere else, respondent said he hit T.W. in the side, and T.W. had thrown up "some white stuff." Respondent said T.W. then stopped crying, and respondent carried him to the children's bedroom. T.W. went to sleep.

¶ 24    After interviewing respondent, Norman went into the other bedroom and noticed that Todd had an abrasion on his lip and a little swelling. When she asked what happened, respondent, who had followed her into the bedroom, said he hit Todd in the mouth. Todd was nonverbal and could not tell Norman what happened.

---

[3]According to Dr. Cuneo's written report that was filed with the trial court, a representative from Chestnut Mental Health Services advised Dr. Cuneo that the diagnosis of posttraumatic stress disorder was based on a series of trauma at respondent's house, *i.e.*, respondent reported being repeatedly bullied, burned, and beaten by Dre, and living in fear of Dre.

¶ 25     Over the State's objection, Norman testified regarding statements Dre made when she interviewed him. According to Norman, Dre told her that all five children were in the playroom, but he took Todd and Tymerian into the parents' bedroom to watch a movie. Dre never told her that he saw respondent hit T.W. Dre did say that after he saw respondent carrying T.W. into the children's bedroom, Dre went to that bedroom and saw T.W.'s stomach "jumping."

¶ 26     The State next called 11-year-old Dre. He acknowledged that, prior to his testimony that morning, he watched the video of the statement he gave at the Child Advocacy Center. Dre then testified that on the afternoon of August 22, 2012, he was home with respondent and Alisha's three children, Todd, Tymerian, and T.W. The adults had all gone to his "granny's" house. Dre was watching a movie in his mother's bedroom, while the other four children were in the back room watching television. Dre testified that he heard a "boom, boom" and investigated, but saw nothing wrong. After he heard another "boom, boom," he went to the back room and picked up T.W. According to Dre, "his whole body just fell down like he was dead or something." Dre testified that he put T.W. on his mother's bed and called his mother, Melissa. No one answered. He called a second time, and his mother passed the phone to Alisha. Dre told her that he thought something was wrong with T.W.

¶ 27     Dre testified that the adults did not arrive home for 1 hour and 30 minutes. During that time, Dre heard T.W. making funny noises. When the adults arrived home, no one checked on T.W. Dre testified that he saw T.W.'s fists "balled up" and his stomach "going in and out." Around 2 a.m., Melissa woke up everyone and the police arrived.

¶ 28     Dre did not see respondent hit T.W., and does not know who moved T.W. from his mother's bedroom to the children's bedroom where he and respondent slept. Dre denied hitting T.W. or respondent.

¶ 29     Dre admitted that he lied in the statement he gave at the Child Advocacy Center. In that statement he indicated that "Fatty" and "Pooh," two individuals who used to live around the corner from the family, were at the house on August 22, 2012, when T.W. was injured. Dre also lied in his statement when he said his mother, Melissa, was outside at the time, rather than at his "granny's" house. Dre said he made those statements because he did not want his mother and the other adults to get in trouble. "If we would have told them that we was in the house by ourselves they probably would have tooken my mama and them to jail." On cross-examination, Dre explained that his mother told him, during the car ride to the Child Advocacy Center, that he should say that Fatty and Pooh were at the house on August 22. Respondent and his father, David, were also in the car when Melissa coached Dre. According to Dre, David told him not to say that respondent hit T.W. because nobody knew who did.

¶ 30     Dre also testified on cross-examination about a previous head injury to T.W. Dre indicated that Fatty was holding T.W. up in the air when the infant fell from his hands. Dre saw T.W. hit the top of his head on a glass table, and begin to cry. Dre denied that T.W. also fell from the table to the floor.

¶ 31     Joyce W., Melissa's stepmother, testified that she would see respondent about twice a month when Melissa and David came over, and that she treated respondent like one of her own grandchildren. On August 22, 2012, Melissa, David, Daveon, and Alisha came over after dinner. Joyce testified that Alisha received two phone calls and that during the second call, "she gave Melissa the phone and told her Dre on the phone, something about little Dave had hit

- 7 -

her baby." Joyce testified that they did not leave immediately, were not in a rush, and left at 8:30 or 9 p.m. Later that evening, Melissa called Joyce and told her that something was wrong with T.W., and that she could not get in touch with T.W.'s mother, Alisha. Melissa called her again, this time from the hospital.

¶ 32   Joyce further testified that between 1 and 2 a.m., on August 23, 2012, Melissa, David, Dre and respondent arrived at her home. Joyce could not believe that respondent hit T.W., so she asked him, "Did you hit the baby?" Respondent answered, "Yeah," and was expressionless. Despite respondent's answer, Joyce still found it difficult to believe that respondent could have hit T.W.

¶ 33   Detective Adams testified that he was assigned as the lead detective to investigate the injuries to T.W. He stated that a nurse practitioner at Cardinal Glennon Children's Hospital advised him that the situation was grim because T.W. had traumatic brain injury and was bleeding from the brain. She also advised that there were both old and new injuries. Adams obtained an affidavit from a physician at the hospital indicating that the injuries were nonaccidental. After speaking with the DCFS investigator, attending Dre's interview at the Child Advocacy Center, and speaking with numerous witnesses, Adams interviewed respondent on August 24, 2012, and again on August 26, 2012. Adams did not learn about T.W.'s death until after the second interview.

¶ 34   Over respondent's objection, the video recordings of the two interviews were admitted into evidence and played for the court. Contrary to other evidence received at the discharge hearing, the video recording of the first interview discloses that David told Detective Adams that he was home with the children on August 22, 2012, although he was in bed because he works nights.

¶ 35   As to the other details captured in the two recordings, at this time, we note only that during the first interview respondent denied hitting T.W. and implicated Dre. Respondent also explained that he told DCFS that he hit T.W. only because he was afraid his father, Melissa and Alisha would otherwise go to jail.

¶ 36   During the second interview, respondent again implicated Dre, denying numerous suggestions by Adams that it was really respondent who hit T.W. After Adams repeatedly assured respondent that no consequences would attach to an admission and that any injury was simply an accident, respondent eventually admitted to hitting T.W. once in the side.

¶ 37   The State's final witness was Dr. Jennifer Forsyth, who performed the autopsy of T.W. on August 27, 2012. At the time of her testimony, the autopsy report was not yet available and the death certificate had not yet been certified. Dr. Forsyth testified that the cause of death was closed head injury, the manner of death was homicide, and the mechanism of death was "diffuse axonal injury" (trauma throughout the brain) and "cerebral edema" (brain swelling). A person with this type of injury would quickly become lethargic, nonresponsive, and limp, and might suffer seizures. Also associated with such an injury is vomiting and a flexing of the hands into a fist. Dr. Forsyth further testified that diffuse axonal injury is not associated with general childhood trauma, like falling off a bicycle or changing table; a greater impact, or possibly shaking, is required. Although T.W.'s injuries were consistent with injuries that could have been sustained on August 22, 2012, Dr. Forsyth acknowledged that it was not possible to determine exactly when or how T.W.'s injuries were inflicted or whether he was shaken. When asked whether any injury received by the infant below the neck, such as to the

chest or abdomen, would have been a cause of death, Dr. Forsyth stated that she did not observe any injury below the neck either at the autopsy or microscopically.

¶ 38 The State argued in closing that respondent was solely responsible for T.W.'s injuries, but that even if the court entertained the possibility that Dre was involved, respondent's admission to Detective Adams that he hit T.W. once in the side is sufficient to meet the State's burden to prove first degree murder under an accountability theory.

¶ 39 On June 5, 2013, the trial court entered an order finding respondent not not guilty of first degree murder, and that the treatment period for fitness restoration may be extended to the maximum statutory period of five years. See 725 ILCS 5/104-25(d)(2) (West 2012).

¶ 40 Respondent appealed, arguing that "(1) the trial court erred in denying his amended motion to suppress statements, (2) the trial court erred in allowing Dr. Forsyth to testify as an expert witness, (3) the trial court erred in finding him not not guilty of first-degree murder, and (4) he was prejudiced by the unavailability of T.W.'s death certificate and autopsy report." 2013 IL App (5th) 130341-U, ¶ 29. The appellate court majority held that the trial court's findings that respondent voluntarily waived his *Miranda* rights and his statements to Detective Adams were voluntary were against the manifest weight of the evidence. Although acknowledging that a valid question exists as to whether the interviews were custodial, the majority nonetheless noted that the interviews "had too many of the indicia of custodial interrogation." *Id.* ¶ 41. The appellate court reversed and remanded without considering respondent's other arguments. *Id.* ¶ 42.

¶ 41 The dissenting justice would have held that any error in the admission of respondent's statements was harmless because his statements were largely exculpatory, and the one lone inculpatory statement was cumulative of other evidence, *i.e.*, the statements he made to Edna Norman and Joyce W. *Id.* ¶ 46 (Wexstten, J., dissenting).

¶ 42                                                    ANALYSIS

¶ 43 The State argues on appeal that the trial court properly denied respondent's motion to suppress statements and urges us to reverse the appellate court judgment. The State contends that respondent was not in custody when he was questioned by Detective Adams and, thus, no *Miranda* warnings were required. See *J.D.B. v. North Carolina*, 564 U.S. ___, ___, 131 S. Ct. 2394, 2402 (2011). The State continues that because *Miranda* warnings were not required, whether respondent knowingly and voluntarily waived his *Miranda* rights is not at issue in this appeal. The State further contends that the circumstances surrounding the questioning of respondent demonstrate that his statements were voluntary and, therefore, properly admitted at the discharge hearing. In the alternative, the State argues that even if the admission of respondent's statements was error, any error was harmless beyond a reasonable doubt.

¶ 44 Respondent also focuses on the question of whether he was in custody when questioned by Detective Adams, arguing that an affirmative answer to that question would implicate his statutory right to an attorney under section 5-170(a) of the Juvenile Court Act (705 ILCS 405/5-170(a) (West 2012)). This provision, which respondent cited in his suppression motion, states: "In a proceeding under this Article [*i.e.*, the Delinquent Minors Article], a minor who was under 13 years of age at the time of the commission of an act that if committed by an adult would be a violation of Section 9-1 *** of the Criminal Code [first degree murder] *** must be represented by counsel during the entire custodial interrogation of the minor." 705 ILCS

405/5-170(a) (West 2012). Respondent maintains that a violation of section 5-170(a) requires suppression of a minor's statements.

¶ 45    Respondent also argues that in light of his intellectual limitations and what he characterizes as the coercive nature of the interviews, his inculpatory statements to Detective Adams were not voluntary and should have been suppressed. Finally, respondent argues that based on the evidentiary record, admission of his statements was not harmless error.

¶ 46    A trial court's ruling on a motion to suppress is reviewed under a two-part standard: the trial court's factual findings will be reversed only if they are against the manifest weight of the evidence, but the trial court's ultimate legal ruling on whether suppression is warranted is reviewed *de novo*. *People v. Colyar*, 2013 IL 111835, ¶ 24.

¶ 47    In light of the rulings below and the parties' arguments on appeal, we consider first whether respondent was in custody when questioned by Detective Adams.

¶ 48                                                                      I

¶ 49    Preliminarily, we consider whether the test for determining whether respondent was in custody for purposes of section 5-170(a) of the Juvenile Court Act is any different than the test for determining whether he was in custody for purposes of *Miranda*. Respondent cites the statutory definition of "custodial interrogation" found in another section of the Juvenile Court Act that governs the custodial interrogation of arrested minors. See 705 ILCS 405/5-401.5(a) (West 2012); *In re Randall M.*, 231 Ill. 2d 122, 129 (2008). That definition provides that a custodial interrogation "means any interrogation (i) during which a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." 705 ILCS 405/5-401.5(a) (West 2012). The only reported case that considered that definition simply considered the factors utilized in the *Miranda* custody analysis. See *People v. Travis*, 2013 IL App (3d) 110170, ¶ 44. Assuming, without deciding, that the definition of "custodial interrogation" in section 5-401.5(a) of the Juvenile Court Act also applies to section 5-170(a), we will use the *Miranda* custody test to address both parties' contentions as to whether respondent was in custody when questioned by Detective Adams.

¶ 50    Whether a person is in custody, and thus whether the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966), are required, involves two discrete inquiries: " 'first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). This is an objective inquiry " 'designed to give clear guidance to the police.' " *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2402 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 668 (2004)). As *J.D.B.* explains:

> "Police must make in-the-moment judgments as to when to administer *Miranda* warnings. By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave, the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." *Id.*

¶ 51    This court has identified several factors relevant to the first inquiry: "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *People v. Slater*, 228 Ill. 2d 137, 150 (2008). After considering and weighing these factors, the court must make an objective determination as to whether a reasonable person, innocent of wrongdoing, would have believed he or she was free to terminate the questioning and leave. *Id.* Where, as here, the person questioned is a juvenile, the reasonable person standard is modified to take that fact into account. *Braggs*, 209 Ill. 2d at 508-10; see also *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2399 ("a child's age properly informs the *Miranda* custody analysis"). As we explained in *Braggs*, "If *** we are concerned with what a reasonable person 'in the defendant's shoes' [citation] would have thought about his or her freedom of action, the reasonable person we envision must at least wear comparable footwear." *Braggs*, 209 Ill. 2d at 508.

¶ 52    After thoroughly reviewing the video recordings of the two interviews of respondent, as well as Detective Adams's testimony at the suppression hearing, we conclude respondent was not in custody when he was questioned. Both interviews took place in surroundings familiar to respondent—his home, at his kitchen table. Detective Adams was the only officer present. He wore his service revolver, but was not in uniform. "Other things being equal, a suspect questioned in familiar (or at least neutral) surroundings does not face the same pressures as one questioned in a police-dominated atmosphere," such as the station house. *People v. Vasquez*, 393 Ill. App. 3d 185, 190 (2009) (citing 2 Wayne R. LaFave, Jerold H. Israel, Nancy J. King & Orin S. Kerr, Criminal Procedure § 6.6(e), at 738-39 (3d ed. 2007)). Although each case must rise or fall on its own facts, the view that at-home questioning is indicative of noncustodial questioning "is strengthened when the suspect's friends or family members were present at the time." 2 Wayne R. LaFave *et al.*, Criminal Procedure § 6.6(e), at 740 (3d ed. 2007). Here, respondent's father was present for both interviews, even though he assumed a passive role in the second interview. In addition, each interview began in the early evening, and lasted between 30 and 40 minutes. These factors also militate against a finding that respondent was in custody. See *Vasquez*, 393 Ill. App. 3d at 192.

¶ 53    As to the mood and mode of questioning, Detective Adams adopted a conversational tone and, at the first interview, asked respondent and his father permission to ask questions. Although Adams's questioning during the second interview was highly suggestive (an issue we take up in part II of our analysis), we cannot say that Adams badgered respondent or was openly aggressive or hostile.

¶ 54    Turning to respondent's age, intelligence and mental makeup, Detective Adams was aware that respondent was just nine years old. Indeed, he testified that he had concerns about questioning someone so young. The State concedes that this factor favors a finding that respondent was in custody. It is, however, only one factor of many that we must consider. We note, too, that respondent does not request this court to adopt a bright-line rule that a nine-year-old child is necessarily and always "in custody" during police questioning.

¶ 55    The appellate court questioned whether a nine-year-old of respondent's intellectual level would feel free to leave or stop the interview. 2013 IL App (5th) 130341-U, ¶ 41. Detective

Adams testified, however, that he was unaware of respondent's mental deficits. The video recording of the first interview reveals that Adams asked respondent's father if respondent had any mental illness or special needs. Respondent's father noted that his son had asthma, but otherwise answered in the negative. Our own review of the video recordings does not lead this court to conclude that respondent's mental deficits were objectively apparent. Accordingly, respondent's mental deficits do not inform the custody analysis. See *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2404 (*Miranda* custody analysis does not require officers to consider circumstances "unknowable" to them, but does require officers to consider the child's age if it would have been "objectively apparent"); *Braggs*, 209 Ill. 2d at 508 (only general and "readily discernible" characteristics of the person can be incorporated into the reasonable person standard for purposes of *Miranda* custody analysis).

¶ 56    Because we conclude that respondent was not in custody when he was questioned by Detective Adams and, therefore, *Miranda* warnings were not required, we need not consider whether respondent voluntarily waived his *Miranda* rights. We also need not consider further whether respondent would have been entitled to counsel under section 5-170(a) of the Juvenile Court Act.

¶ 57                                                        II

¶ 58    Although Detective Adams was not required to provide *Miranda* warnings to respondent, the constitution yet requires that respondent's inculpatory statements be voluntary. *Slater*, 228 Ill. 2d at 159-60 (citing *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976), and *People v. Melock*, 149 Ill. 2d 423, 452 (1992)). The requirement that a confession must be voluntary to be admissible in evidence in a criminal trial has its roots in both the self-incrimination clause of the fifth amendment, and the due process clause of the fourteenth amendment. *Missouri v. Seibert*, 542 U.S. 600, 607 (2004) (citing *Bram v. United States*, 168 U.S. 532 (1897) (self-incrimination), and *Brown v. Mississippi*, 297 U.S. 278 (1936) (due process)); see also *People v. Richardson*, 234 Ill. 2d 233, 252 (2009) (discussing the constitutional underpinnings of the voluntariness requirement). Generally, the question in voluntariness cases "is whether the defendant's will was overborne at the time he confessed." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). "If so, the confession cannot be deemed 'the product of a rational intellect and a free will.'" *Id.* (quoting *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960)); see also *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996) ("the test of voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed").

¶ 59    In determining whether an individual's will was overborne or overcome, courts consider "the totality of all the surrounding circumstances," *i.e.*, "both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); accord *Richardson*, 234 Ill. 2d at 253. Characteristics of the accused include age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning. *Id.* The court may also consider, where appropriate, whether the accused was found unfit for trial. See *Slater*, 228 Ill. 2d at 161. Details of the interrogation include the legality and duration of the detention; the duration of the questioning; the provision of *Miranda* warnings; and, in the case of a juvenile, the presence of a "concerned adult." *Richardson*, 234 Ill. 2d at 253-54. The presence of any physical or mental abuse by police,

including threats or promises, as well as the use of trickery, deception, or subterfuge, are also relevant. *Id.*; *Melock*, 149 Ill. 2d at 450. No single factor is dispositive. *Gilliam*, 172 Ill. 2d at 500.

¶ 60 Significantly, the Supreme Court has recognized that where, as here, "a mere child—an easy victim of the law—is before [the court], special care in scrutinizing the record must be used." *Haley v. Ohio*, 332 U.S. 596, 599 (1948). This court has similarly recognized that "the receiving of an incriminating statement by a juvenile is a sensitive concern." *People v. Prude*, 66 Ill. 2d 470, 476 (1977); accord *In re G.O.*, 191 Ill. 2d 37, 54 (2000). Thus, the "greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." (Internal quotation marks omitted.) *Prude*, 66 Ill. 2d at 476 (quoting *People v. Simmons*, 60 Ill. 2d 173, 180 (1975), quoting *In re Gault*, 387 U.S. 1, 55 (1967)).

¶ 61 In light of these concerns, we view respondent's age as a key factor in the voluntariness analysis. As the Supreme Court has acknowledged:

> "A child's age is far 'more than a chronological fact.' *Eddings* v. *Oklahoma*, 455 U.S. 104, 115 (1982); accord, *Gall* v. *United States*, 552 U.S. 38, 58 (2007); *Roper* v. *Simmons*, 543 U.S. 551, 569 (2005); *Johnson* v. *Texas*, 509 U.S. 350, 367 (1993). It is a fact that 'generates commonsense conclusions about behavior and perception.' *Alvarado*, 541 U.S., at 674 (BREYER, J., dissenting). Such conclusions apply broadly to children as a class. And, they are self-evident to anyone who was a child once himself, including any police officer or judge.
>
> Time and again, this Court has drawn these commonsense conclusions for itself. We have observed that children 'generally are less mature and responsible than adults,' *Eddings*, 455 U.S., at 115-116; that they 'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them,' *Bellotti* v. *Baird*, 443 U.S. 622, 635 (1979) (plurality opinion); that they 'are more vulnerable or susceptible to … outside pressures' than adults, *Roper*, 543 U.S., at 569; and so on. See *Graham* v. *Florida*, [560 U.S. 48, 68 (2010)] (finding no reason to 'reconsider' these observations about the common 'nature of juveniles')." *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2403.

¶ 62 In the specific context of police interrogation, the Supreme Court has observed that circumstances and events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley*, 332 U.S. at 599. "[N]o matter how sophisticated," a juvenile who is subject to police questioning "cannot be compared with an adult" subject. *Gallegos v. Colorado*, 370 U.S. 49, 54 (1962). Thus, respondent's young age, alone, is a fact from which this court can draw inferences about his judgment and susceptibility to influences and pressures during the course of police questioning.

¶ 63 This court's voluntariness assessment, however, is not limited to commonsense conclusions about nine-year-olds or children generally. Unlike the *Miranda* custody analysis in this case, which considers a hypothetical reasonable juvenile (see *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2402; *Braggs*, 209 Ill. 2d at 508-10), the voluntariness analysis is based on a particular juvenile. See generally *J.D.B.*, 564 U.S. at ___, 131 S. Ct. at 2410 (Alito, J., dissenting, joined by Roberts, C.J., Scalia and Thomas, JJ.) (observing that the "all-encompassing nature of the voluntariness inquiry" allows courts to make a "highly

individualized determination"). The question at issue here is not whether a reasonable or average nine-year-old's will would have been overborne by the circumstances attendant to the police questioning in this case, but whether this particular nine-year-old's will was overborne.

¶ 64 At the time of the suppression hearing in March 2013, the trial court had already found respondent unfit to stand trial, meaning that respondent was "unable to understand the nature and purpose of the proceedings against him or to assist in his defense." 725 ILCS 5/104-10 (West 2012). Respondent expressly relied on that finding in his written suppression motion and, at the suppression hearing, asked the trial court to take judicial notice of the entire case file to that point, including all prior orders. The trial court agreed to do so.

¶ 65 At the time of the suppression hearing, the case file also included the written report prepared by Dr. Cuneo, who evaluated respondent for fitness, just days after the police questioning in this case. Because Dr. Cuneo was the only witness at the fitness hearing, the trial court's finding of unfitness was necessarily based on Dr. Cuneo's evaluation of respondent. As detailed earlier in this opinion, Dr. Cuneo concluded that respondent's cognitive abilities were only at the seven- to eight-year-old level, and that his borderline intellectual functioning, coupled with his age and developmental immaturity, substantially impaired his ability to understand the nature and purpose of the legal proceedings and to assist in his own defense. Respondent could not grasp how a person is found guilty, and could not understand the role of a defense attorney.

¶ 66 At the time of the suppression hearing, the court file also included a report, filed by the DHS on November 28, 2012, stating that "[t]here are no known prior arrests," and "no history of incarceration with the Department of Corrections or juvenile program in the State of Illinois or other state."

¶ 67 These characteristics of respondent—his young chronological age, his even younger mental age, his mental deficits, his lack of experience with law enforcement, and his inability to understand the legal proceedings—are factors that color the lens through which this court necessarily views the circumstances of the police questioning in this case.

¶ 68 With respect to the first interview on August 24, 2012, Adams began by obtaining basic information about respondent, and the Cahokia household. Adams then read respondent the *Miranda* warnings, and attempted to explain concepts the nine-year-old did not understand. After all the warnings were provided, respondent received instructions on how to "initial" the *Miranda* waiver form, a concept he did not grasp. Adams spoke to respondent in a conversational tone, and after obtaining permission to speak with him, Adams elicited general information from both respondent and David about who was present in the home on the evening of August 22, 2012, when T.W. was injured. Adams generally asked open ended questions about what happened that evening. Respondent immediately implicated Dre in T.W.'s injuries. Significantly, when Adams asked respondent if he remembered what he told the woman from DCFS, respondent answered: "I told her I did it." Respondent immediately explained, however, that he said that only because he did not want his dad, Melissa, or Alisha to go to jail. David warned his son: "If you didn't do nothing like that, don't admit that you did it. You're putting yourself in danger." Upon further questioning, respondent again implicated Dre, stating that Dre gets mad and hits the kids. Respondent said he, himself, does not hit kids; he plays with them; he tries to make them laugh. Respondent agreed with Adams that he made a mistake when he told DCFS that he hit T.W., and that he was trying to make sure nobody got

- 14 -

into trouble. Respondent added: "Especially I got real scared 'cause I thought I was gonna get tooken away." Adams assured respondent that he was not there to take him away. When asked again what happened on the evening of August 22, respondent said that Dre kept hitting T.W. in the head because he was crying, and that he told Dre several times to stop.

¶ 69 In considering the numerous factors that impact our voluntariness analysis, we note at the outset that we place little stock in the fact that Detective Adams provided *Miranda* warnings to respondent. Although the State argues that the trial court's finding that respondent voluntarily waived his *Miranda* rights is not against the manifest weight of the evidence, we question whether this low-functioning nine-year-old, who could not grasp the role of a defense attorney or understand how a person is found guilty or innocent, could possibly understand the *Miranda* warnings. Detective Adams did attempt age-appropriate explanations, but those attempts were not necessarily successful. For example, when Adams told respondent, "If you do talk to me or us, everything that you say can be used against you in a court," Adams offered this cryptic explanation:

> "What that means, little Dave, is say, for instance, we start talking. Okay? And you start telling me about something that happened. Now I'm not saying it did, but say you did. Everything that you tell me can be used in a court. Okay? Can be used against you in a court. Okay? To either try you as either guilty or innocent, is what that means. Okay? So what we talk about now on this tape is—yeah, we're still recording—everything that we talk about will be, can be used in court. That means attorneys and everybody else. That's what that means."

¶ 70 Putting aside whether respondent had the intellectual capacity to understand his *Miranda* rights, their provision, in any event, was completely gratuitous. Respondent, who was not in custody, did not have the right to counsel, or to have counsel appointed at no charge. Thus, respondent's understanding of rights he could not have exercised is inconsequential in the voluntariness calculus.

¶ 71 With respect to the other factors that inform our voluntariness analysis, we conclude that, notwithstanding respondent's young chronological age, and his even younger mental age, respondent's will was not overborne during the first interview when he acknowledged telling DCFS that he "did it." The questioning, which we have already determined was noncustodial, was not prolonged, the tone was conversational, not accusatory, and the questions Adams asked—including the question regarding respondent's admission to DCFS—did not suggest the answers. Adams made no threats. Although he assured respondent that he was not there to take him away, he did not belabor the point or make other promises to elicit a confession. Moreover, David was at respondent's side and provided sage advice about not making any admissions. Because respondent's statement was voluntary, the trial court properly denied respondent's suppression motion with respect to the first interview.

¶ 72 The second interview, however, proceeded in a markedly different fashion. Adams provided a quick, *i.e.*, 45-second, review of the *Miranda* warnings respondent had received two days prior. Adams then asked David to move his chair away from the table where respondent was seated. Adams testified at the suppression hearing that he did not want David interjecting anything during the interview. In response to Adams's questions, respondent again implicated Dre in T.W.'s injuries, and denied that he, himself, had hit the infant. Adams

advised respondent, "I think I know what happened," and then launched into the first of two monologues:

"I think what happened is—I want you to be honest with me and I don't want to tell you something. Okay? I really don't. Listen to me, little man. I don't want to put anything in your head that's not true. Okay? I don't. Because I'm here, and I'm going to leave after I get done talking to you, and you're not going anywhere. Okay? You're going to stay here. I promise you that. Okay? I'm not here to take you to jail. I'm not here to take you anywhere away from your daddy. You understand that? So I want you to understand that. Okay? I really do. I promise you I'm not taking you away from your daddy. Okay? Yes, I'm a police officer, and yes I have to come out and talk to people and stuff like that because we have a situation here as far as something happened. Okay? Something happened, and nobody knows what happened except who was in the room. Okay? That's why I'm talking to you buddy. And I just want you to know it's okay if you want, if there's something going on here, or if you're afraid that maybe you made an accident or something like that, I understand. Okay? Everybody makes mistakes. And that's from me to you. Okay? I promise you that. Everybody makes mistakes, little Dave. I make mistakes every day. I know I do. Okay? Everybody makes mistakes, little Dave. But everything we've got, we've talked to people. Okay? You know how investigations work and stuff like that. You've ever seen on CSI and stuff is, something happens and then we have to go and talk to this person, and then we to talk to this person, and then we talk to this person. We have to figure out what happened. Okay? But what we've got now is I think Drequon was in another room watching a movie whenever something happened in the room back there. Okay? And if it did, I just want to know the truth. That's all I want to know. Because I find out the truth, and I go home. You stay here. You can go to granny's after this. Correct? That's all I want, little Dave. I don't want you to have to feel like you have to cover for somebody. I don't want you to feel like somebody's going to get into trouble. I don't want you to feel that guilt or something, okay, as far as you might give me information to make someone look good or bad. Okay? I just want to know the truth. That's all I want to know, little Dave. I promise you that's all I want to know. Okay? If you did hit Quan Quan [T.W.], I just need to know that and then I need to ask you where you hit him, and I know it wasn't a lot of times. I know it wasn't, but if you did I just want you to be honest with me. It's okay. I'm leaving. I'm not going to take you to jail. I promise you. Do you understand that? You are not going to go to jail, buddy. You're not. I just want to find out the truth. That's all my job consists of whether you're 9 or 99. I still gotta find out the truth. Okay? So let me ask you this, little Dave, okay? Just between me and you and your dad sitting right over there, *can you just tell me, by chance did you hit Quan Quan, just once?*" (Emphasis added.)

¶ 73     Respondent denied that he hit the infant, and again implicated Dre, providing details about the incident in response to Adams's questions. Adams continued with his theme that mistakes or accidents happen: "Everybody makes accidents, even me. I know it's hard to believe, but I make accidents every day. I make oopses. I do." Respondent provided additional details, but still failed to admit any wrongdoing. Adams then proceeded with his second monologue:

"But at no time, and I just want to ask 'cause again I want to make sure you understand this. And if you did, I need you to tell me, okay? At no time did you ever hit Quan

Quan? If you did, I just need to know. [Respondent shakes his head no.] Are you sure, little Dave? I think, I think you're just afraid and I don't want you to be afraid. Okay? Don't be afraid of me. I'm not here to harm you. Okay? I'm not here to cause any harm whatsoever on you, or your dad or Melissa or anybody. Okay? I'm just here to talk to you, buddy. That's it. But what I think you're not telling me is, I think you did hit him. And if you did, I just need to know. 'Cause again, I'm not taking you nowhere. Do you understand that, little Dave? You're not going to jail, little Dave. Okay? You're not. You're not going to a juvenile detention center. You're not going to prison. Daddy's not going to prison. Melissa's not going to prison. Nobody's going to jail. Okay? Nobody's going to jail. But I think there's something that you're not telling me, and again I don't want you to tell me something that is not true, little Dave, I don't. But people make mistakes. I do, and I think you made a mistake. I think it was an accident, I really do. I think it was a total accident 'cause he wasn't, he wouldn't quit crying. And I don't think Drequon hit him. I really don't think so. I think you did, and I think that you're just telling me Drequon did. But again, I just want to know. It's okay. Because either way you're not in trouble. Okay? I'm not taking anybody to jail; I'm not taking you away from your family. Do you understand that, little Dave? Okay. *Are you sure you just didn't make an accident, maybe hit him, just punch him one time?* And if you did, I need to know. Just tell me the truth is all I want, little Dave. You're not going to go anywhere. Do you understand that? Do you specifically, are you truly understand what I'm saying little Dave? I'm not taking you anywhere. I'm not. But for little Quan Quan I need to know. Okay? Because a lot of people want to know what happened. I think you made a mistake; I really do. And I just need you to tell me you made a mistake, and then we need to go on with it. Okay? Because after you tell me, I'm going to get back in my car and go and you can go to your grandmama's house. Probably never see me again. Probably a good thing, ain't it? You don't like cops in your house, right? Nobody likes police officers in their house. I don't. I'm a cop. Okay? Do you understand me, little man? I'm not taking you anywhere, young man. I done told your daddy this, okay? And I want you to know 100%. I'm not lying to you. I'm not taking you nowhere, little Dave. I think what happened was an accident. I really do. So can you please tell me, just forget everything we've talked about. Okay?" (Emphasis added.)

¶ 74  After additional comments and questions, respondent stated it was Dre who hit T.W., but that he, himself, hit T.W. "once." In response, Adams told respondent:

"It's okay. You're still going to go to grandma's tonight. You're still going to hang out with dad. I told you, I'm not here to put you in jail. Okay? That's my promise to you, and this is all video and audio and videotaped. Okay? So I can't lie. Okay? I'm not lying to you, little man, and I'm not lying to your dad right there. I promise that."

Upon questioning, respondent stated that he "just joined in" and hit T.W. in the side once with his hand.

¶ 75  Contrary to what actually transpired during his questioning of respondent during the second interview, Detective Adams testified at the suppression hearing that "you'll never, ever, ever hear me say 'promise' in an interview." Adams also testified that he did not believe

the injuries to T.W. were the result of an accident, and admitted that he employed "lying and trick tactics" when he questioned respondent.

¶ 76    The use of deception or subterfuge does not alone invalidate a confession as a matter of law, but it is a factor to consider in examining the totality of the circumstances. *Melock*, 149 Ill. 2d at 450. So, too, is the use of promises to induce a confession. *In re L.L.*, 295 Ill. App. 3d 594, 600 (1998). Based on the circumstances of the second interview, we conclude that respondent's inculpatory statements that he hit T.W. were not given voluntarily and that evidence of the second interview should have been suppressed.

¶ 77    We have already concluded that the provision of gratuitous *Miranda* warnings during the first interview does not affect the voluntariness calculus. That conclusion applies equally to the 45-second *Miranda* review that preceded the questioning of respondent at the second interview.

¶ 78    With respect to the presence of respondent's father, David, Detective Adams marginalized David's presence in the second interview by moving him away from respondent's side. And, in fact, David assumed a passive role during the second interview. The only time David tried to interject something—and Adams cut him off—was when Adams tried to clarify whether David was in the home at the time T.W. was injured. Thus, in contrast to the first interview, the "concerned adult" factor in the second interview does not weigh heavily in favor of voluntariness.

¶ 79    As to the interaction between the detective and respondent, although Adams adopted a conversational tone during the second interview just as he had in the first interview, that is where any similarity between the two interviews begins and ends. From the outset of the second interview, Adams seized on respondent's fear that his father, Melissa or Alisha would go to jail, or that he, himself, would be taken away. Adams promised respondent that no matter what he said, no one was going to jail, no one would be in trouble, he would not be taken from his father and, at the end of the day, he could go to his grandmother's house and "hang out" with his dad. Adams continually reinforced the notion that no consequences would attach to an admission by respondent that he hit T.W. Adams also rejected respondent's repeated denials of wrongdoing, making plain that anything less than an admission was unacceptable. Adams further downplayed the significance of an admission, unceasingly telling respondent that whatever happened was an accident or a mistake, and everybody makes mistakes, even the detective. Adams was also explicit about the kind of admission that would suffice—an admission that respondent hit T.W. once. Respondent eventually admitted to just that: hitting the infant *once*. Though an adult might very well have been left "cold and unimpressed" with Adams's mode of questioning (*Haley*, 332 U.S. at 599), respondent was just a boy of nine, functioning at the level of a seven- or eight-year-old, and thus was far more vulnerable and susceptible to police coercion of this type. The trial court erred in denying respondent's suppression motion as to the second interview.

¶ 80    The State argues, as it did in the appellate court, that any error in the admission of respondent's statements to Detective Adams was harmless in light of the other competent evidence of guilt, including the inculpatory statements respondent made to the DCFS investigator and Joyce W. The appellate majority, however, remanded this case to the trial court for a new discharge hearing without conducting harmless error review. We note that the State argued, in its petition for leave to appeal, that the appellate majority erred by failing to

conduct a proper harmless error analysis. We note, too, that the appellate court did not entertain respondent's argument challenging the sufficiency of the evidence supporting the trial court's not not guilty finding.

¶ 81    We, therefore, remand this case to the appellate court to set forth its analysis of the harmless error issue, in light of our holding. The appellate court is also directed to consider any other claims of error previously raised but not decided that are necessary to the proper disposition of this case.

¶ 82    Affirmed in part and reversed in part.

¶ 83    Cause remanded.

¶ 84    JUSTICE BURKE, specially concurring:

¶ 85    I agree with the majority that respondent's confession, made during the second interview with Detective Adams on August 26, 2012, was not voluntarily made and, for that reason, the trial court erred in denying respondent's motion to suppress that statement. I also agree that the matter must be remanded to the appellate court for review of the State's claim that the admission of respondent's confession to Detective Adams was harmless error. I write separately because I disagree with the majority's conclusion that respondent was not "in custody" when he was interrogated by Detective Adams.

¶ 86    In asserting that he was "in custody" when questioned by Detective Adams, respondent contends that we should apply the statutory definition of "custodial interrogation" found in section 5-401.5(a) of the Juvenile Court Act, which provides that a custodial interrogation "means any interrogation (i) during which a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." 705 ILCS 405/5-401.5(a) (West 2012). I agree with the majority that, even if we assume that the definition of "custodial interrogation" in section 5-401.5(a) of the Juvenile Court Act applies here, in practice, the *Miranda* custody test would still be used to determine whether respondent was in custody when he was questioned by Detective Adams.

¶ 87    The *Miranda* custody test involves two discrete inquiries: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt that he or she was not at liberty to terminate the interrogation and leave. *People v. Braggs*, 209 Ill. 2d 492, 505-06 (2003). With regard to the first prong, the following factors have been found relevant in determining whether a statement was made in a custodial setting: the location, time, length, mood, and mode of the interrogation, the number of police officers present, the presence or absence of the family and friends of the accused, any indicia of formal arrest, and the age, intelligence, and mental makeup of the accused. *People v. Slater*, 228 Ill. 2d 137, 150 (2008). After examining these factors, the court must make an objective determination as to " 'what a reasonable [person], innocent of any crime, would have thought had he been in the defendant's shoes.' " *People v. Wipfler*, 68 Ill. 2d 158, 166 (1977) (quoting *Hicks v. United States*, 382 F.2d 158, 161 (D.C. Cir. 1967)).

¶ 88    With regard to the second prong, we said in *Braggs*, "As we consider the age, intelligence, and mental makeup of the accused—and an investigating officer's awareness and exploitation of those characteristics—in our examination of the circumstances surrounding the

- 19 -

interrogation, so those factors are analytically intertwined with the reasonable-person prong of the custodial question." *Braggs*, 209 Ill. 2d at 507. Further, it has become well-established, at least since *Alvarado v. Hickman*, 316 F.3d 841, 848 (9th Cir. 2002), was decided, that where a juvenile is concerned, the "reasonable-person" standard must be modified to reflect what a reasonable juvenile in defendant's position would have thought.

¶ 89    The respondent in this case was just nine years old when he was questioned by Detective Adams. In 2001, our legislature enacted a statute requiring that all children under the age of 13 "*must* be represented by counsel during the entire custodial interrogation of the minor" in relation to the commission of certain crimes, including murder. (Emphasis added.) 705 ILCS 405/5-170(a) (West 2008). The legislature enacted this provision in recognition of the fact that children, particularly young children under the age of 13, because of the clear power differential between police officers and young children, are highly susceptible to coercion by police officers. See Jennifer J. Walters, Comment, *Illinois' Weakened Attempt to Prevent False Confessions by Juveniles: The Requirement of Counsel for the Interrogations of Some Juveniles*, 33 Loy. U. Chi. L.J. 487 (2002). In *Alvarado*, the court noted, "If a juvenile is more susceptible to police coercion during a custodial interrogation, then the same juvenile is also more susceptible to the impression that he is, in fact, in custody in the first instance." *Alvarado*, 316 F.3d at 843. I agree with the *Alvarado* court's observation and believe that, in this case, respondent must be deemed to have been "in custody" when he was interrogated by Detective Adams.

¶ 90    The overriding consideration when deciding whether an interrogation is "custodial" in nature is whether a reasonable person in respondent's shoes would have fully understood and appreciated his or her right to remain silent and terminate the questioning. I do not believe it is possible to conclude that, in this case, anyone in respondent's position would have had such an appreciation. Rather, in my view, all of the attendant circumstances serve to show that anyone in respondent's shoes would have felt that he had no choice and was obliged to speak to Detective Adams.

¶ 91    Certainly the most compelling factor here is respondent's tender age. Although I question whether *any* child—particularly a child under the age of 13—ever truly feels that he or she has the freedom to *not* cooperate with police, it is clear to me that a nine-year-old such as respondent here, who had no prior experience with law enforcement, would have felt compelled to speak to Detective Adams. Furthermore, I believe other circumstances—such as location and presence of a parent—which, in some situations, might point toward a finding that an interrogation was noncustodial, actually cut against such a finding in the present case.

¶ 92    In this case, respondent was interrogated at his home in the presence of his father. These facts indicate to me that respondent would not have felt free to get up and leave. First, since respondent was in his own home, where could he have gone if he wanted to leave? Secondly, the entire interrogation was videotaped and preceded by the detective's "gratuitous" recitation of respondent's *Miranda* rights. Despite assurances that respondent could remain silent (a right which it is unclear whether respondent or any nine-year-old could fully appreciate and understand), I believe the circumstances would lead even an adult to consider himself "in custody." The videotaping of the event lent a certain formality to the interrogation which a nine-year-old with no prior experience could easily have interpreted as being "in custody."

¶ 93    In addition, the fact that respondent's father was present, in my view, only served to place the parent's imprimatur on the questioning. The father played virtually no role in counseling or advising his son. The only time respondent's father advised him was to tell him to "tell the truth," which reinforced the notion that respondent was required to speak to the police.

¶ 94    In light of the above, I would conclude that the questioning by Detective Adams amounted to a "custodial interrogation" within the meaning of section 5-401.5(a) of the Juvenile Court Act, and, as such, it was mandatory that he be represented by counsel during the entire custodial interrogation. Further, I would find that because respondent was not afforded the benefit of counsel, the trial court erred when it refused to suppress the statements respondent made to Detective Adams.

¶ 95    JUSTICE FREEMAN joins in this special concurrence.