# Illinois Official Reports

## Appellate Court

---

### *People v. Wiggen*, 2021 IL App (3d) 180486

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TRICIA A. WIGGEN, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-18-0486 |
| Filed | June 11, 2021 |
| Decision Under Review | Appeal from the Circuit Court of La Salle County, No. 17-CM-930; the Hon. H. Chris Ryan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Karalis, and James Wozniak, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Karen Donnelly, State's Attorney, of Ottawa (Patrick Delfino, Thomas D. Arado, and Stephanie L. Raymond, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | PRESIDING JUSTICE McDADE delivered the judgment of the court, with opinion.<br>Justice O'Brien concurred in the judgment and opinion.<br>Justice Wright specially concurred, with opinion. |

**OPINION**

¶ 1     In a bench trial, the La Salle County circuit court found Tricia A. Wiggen guilty of domestic battery (720 ILCS 5/12-3.2(a)(2) (West 2016)), a Class A misdemeanor. The court sentenced her to one-year conditional discharge. Wiggen appeals, challenging the sufficiency of the State's evidence to sustain her conviction. In the alternative, she asks this court to reverse her conviction and remand the case for a new trial because her trial counsel was ineffective in conducting her defense. For the following reasons, we reject Wiggen's arguments and affirm her conviction.

¶ 2                                   I. BACKGROUND

¶ 3     Wiggen was arrested on December 21, 2017. She waived her right to jury trial and proceeded to a bench trial. The uncontested evidence at trial showed that Wiggen and Robert Wesley lived together at Wiggen's home in Seneca, Illinois from November 2013 until October 25, 2017, when Wesley moved out. He married his wife Amber a week later, on November 1. On November 6, Wiggen filed a petition for an emergency order of protection against Wesley, which the La Salle County circuit court granted. On December 21, following a plenary hearing, the circuit court dismissed the order of protection. On the same day, Wesley returned to Wiggen's home with Amber. Betty Renfro—Wiggen's friend—was present outside the home. At his arrival, Wiggen remained inside and began yelling, then called the police, complaining of a trespass. Lieutenant Harry Kosters of the Seneca Police Department responded to the call. Kosters contacted dispatch requesting backup. From this point on the trial testimony diverges.

¶ 4     Kosters testified that when he arrived at the address, he heard Wiggen yelling from the house and believed it was directed at Wesley, who was gathering sticks in the front yard. He warned Wesley that there was an active order of protection against him, but Wesley told him that the order had been dismissed earlier that day and was no longer in effect. Prompted by the State's direct examination, Kosters testified that he called the police dispatch to determine whether the order was still in effect. Neither the prosecutor nor defense counsel asked Kosters what dispatch had advised him about the order.

¶ 5     Kosters approached the house and spoke to Wiggen through an open window. She told him that she was unlocking the door to let Renfro in. Kosters went toward the doorway while Renfro was walking in. He testified that Wesley walked past him, following Renfro into the house by mere "seconds [or] milliseconds." Kosters entered the house where he "witnessed Trish Wiggen yelling at [Wesley] and then she kind of bull rushed and pushed" Wesley. Kosters saw Wesley fall backwards and believed Wesley was "shooken [*sic*]" but he did not notice any sort of physical injury or bleeding. Kosters placed Wiggen in handcuffs and later transported her to the county jail.

¶ 6     Wesley testified that Wiggen charged him as soon as he entered the house. She hit him in his right eye and on his face. His glasses fell off and he "felt some injury." He explained that the order of protection was dismissed earlier that day; he denied that the judge told him the order was still in effect for another 24 hours. He also denied that he had been in a dating relationship with Wiggen, but he confirmed that he had lived with her. Amber Wesley said that she and Wesley went to Wiggen's home to retrieve his dog. She stated that they entered after Renfro, at which point Wiggen immediately charged Wesley. Amber recalled that Wesley was

"calm and collected," whereas Wiggen was yelling. On cross-examination, she stated that Kosters did not tell them to stay outside of the house.

¶ 7 Chief Ray Meglan of the Seneca Police Department responded to Kosters's call for backup. When he arrived, Meglan observed Kosters handcuffing Wiggen while Wesley was in the bedroom. He attempted to place Wesley under arrest for violating the order of protection. Wesley told Meglan that the order was dismissed. Meglan stated that he "essentially dealt with the order of protection issue" after talking to Wesley. Neither the prosecutor nor defense counsel asked Meglan whether he confirmed if the order was still valid on December 21, 2017. On cross-examination, Meglan stated that he did not observe any injuries on Wesley.

¶ 8 The defense called Betty Renfro as a witness. She testified that Wesley and his wife were in front of Wiggen's house when she got there. She heard Wiggen telling Wesley "that her order of protection was still valid." Wesley said it was not. Wiggen agreed to let Renfro in after the police arrived at the house. Renfro stated that Wesley entered the house immediately after her, using her "as a battering ram." Renfro lost visual on Wesley and Wiggen for "a brief period of maybe 45 seconds to a minute." She heard Wesley screaming: "She hit me, she hit me." Renfro did not see any physical contact between Wesley and Wiggen. She believed that the door would have hit Wiggen when Wesley went in, but she did not see that happen either. On cross-examination, Renfro stated that the order of protection was dismissed earlier that day. She stated that Wiggen told Kosters that the order was still in effect.

¶ 9 Wiggen then testified in her own defense. She stated that she met Wesley in September 2013 through an online dating website. They began living together in November 2013, and Wiggen purchased her house in October 2015. Wiggen stated that she and Wesley were engaged to be married, and Wesley began telling the neighbors that she was his wife.

¶ 10 On November 6, 2017, the La Salle County circuit court granted Wiggen an emergency order of protection but refused to extend it following a hearing on December 21. Wiggen testified that the judge told them the order would be valid for another 24 hours as a cooling off period. After the court hearing, Wiggen went home. Shortly thereafter, Wesley arrived and began banging on her door. Wiggen called the police and reported him as a trespasser. After Kosters arrived at her house, Wiggen opened the door for Renfro but was "hit in the head and in the face with the door" and was falling to the ground. Wiggen extended her hand to reach and grab something so she "wouldn't fall." She thought she was grabbing Renfro but then "realized it was Mr. Wesley's jacket [she] was holding on to." Wiggen testified that Wesley punched her five times as she was falling and while she was on the ground. She did not charge Wesley, nor did she make any kind of physical contact with his face. She testified that Wesley hit her so hard that she lost consciousness for a few seconds. The defense rested after Wiggen's testimony.

¶ 11 During the defendant's closing argument, trial counsel made no argument that the evidence supported an affirmative defense. The trial court then explained how it was looking at the case. It found the issue was a question of credibility. The court stated:

> "If I take off Mr. Wesley and Mrs. Wesley, if I take the defendant and Ms. Renfro them all out, Kosters is it. He's the one that's carrying the day here. He has got no axe to grind here at all. He is not impeached in any fashion or form. *** Officer Kosters makes the day for them. He is the only independent person in here. Any other discrepancies, I don't care. It doesn't affect, it doesn't affect, it doesn't demean Officer Kosters at all. He was unimpeached."

¶ 12    The court found Wiggen guilty of the offense charged and sentenced her to conditional discharge. Wiggen did not file posttrial motions for either a new trial or resentencing. She has, however, appealed her conviction.

¶ 13                                    II. ANALYSIS

¶ 14    On appeal, Wiggen challenges the sufficiency of the State's evidence to sustain her conviction. In the alternative, she argues that she was denied her constitutional right to effective assistance of counsel at trial. We address each issue separately, reject Wiggen's contentions, and affirm her conviction.

¶ 15                        A. Sufficiency of the State's Evidence

¶ 16    In reviewing a challenge to the sufficiency of the evidence, the relevant question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *People v. Petty*, 2020 IL App (3d) 180011, ¶ 18. A conviction will be reversed only where the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.* Where review of the evidence turns on a "statutory interpretation, our review is *de novo*." *People v. Martin*, 2011 IL 109102, ¶ 20. Where the defendant's conviction turns on the credibility of the witnesses, this court, generally, "will not substitute its judgment for that of the trier of fact." *People v. Gray*, 2017 IL 120958, ¶ 35. However, the trier of fact's credibility assessment, though "entitled to great deference," "is not conclusive and does not bind the reviewing court." *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 17    As an initial matter, we note that the First and Second Districts of the Appellate Court of Illinois have recently held that "[a] defendant forfeits an affirmative defense by failing to make it in the trial court." *People v. Shepherd*, 2020 IL App (1st) 172706, ¶ 17 (citing *People v. Bardsley*, 2017 IL App (2d) 150209, ¶ 1). However, neither court cited any principle of law requiring a criminal defendant to expressly plead an affirmative defense. In *Bardsley*, the Second District concluded that raising an affirmative defense for the first time on appeal was effectively the same as arguing that the trial court had erred in not instructing the jury on the defense without the defendant first seeking jury instructions on said defense. *Bardsley*, 2017 IL App (2d) 150209, ¶ 22; see also *Shepherd*, 2020 IL App (1st) 172706, ¶ 17 (relying entirely on *Bardsley* for its ruling on this issue). The comparison is flawed because jury instructions are subject to the ordinary rules of forfeiture on appeal. *People v. Herron*, 215 Ill. 2d 167, 175 (2005).

¶ 18    By contrast, "a 'challenge to the sufficiency of the evidence is not subject to the waiver rule and can be raised by a defendant for the first time on direct appeal, even if not properly preserved.' " *Petty*, 2020 IL App (3d) 180011, ¶ 24 (quoting *People v. Muhammad*, 398 Ill. App. 3d 1013, 1018 (2010)); see *People v. Woods*, 214 Ill. 2d 455, 470 (2005). An affirmative defense may "be raised by the pleadings or the evidence." *People v. Williams*, 96 Ill. App. 3d 8, 16-17 (1981); see also 720 ILCS 5/3-2(a) (West 2016) (an affirmative defense can be raised by either "the State's evidence" or "some evidence thereon" from the defendant). Thus, a defendant may argue that the facts presented at trial established the existence of an affirmative defense in such a manner that the evidence cannot sustain her guilt. Although "slight evidence" is sufficient to entitle the defendant to jury instructions or to make closing arguments on the defense, it does not entitle her to a reversal on appeal because of our standard of review. Under

that standard, we will draw all reasonable inferences in the light most favorable to the State and allow great deference to the trier of fact on issues of witness credibility—when appropriate. *Petty*, 2020 IL App (3d) 180011, ¶ 18.

¶ 19      In Illinois, the affirmative defense of defense of dwelling is codified in section 7-2(a) of the Criminal Code of 2012. It states: "A person is justified in the use of force against another when and to the extent that [she] reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling." 720 ILCS 5/7-2(a) (West 2016). "The primary objective of statutory construction is to ascertain and give effect to the true intent of the legislature." *People v. Casler*, 2020 IL 125117, ¶ 24. "The most reliable indicator of legislative intent is the language of the statute, given its plain and ordinary meaning." *Id.*

¶ 20      Section 7-2(a) requires a reasonable belief both (1) that the victim's entry was unlawful and (2) that use of force was necessary to prevent or terminate his entry. 720 ILCS 5/7-2(a) (West 2016). To conclude otherwise would require us to ignore the legislature's choice of language, give greater weight to the word "unlawful," and thereby render the word "necessary" superfluous. We cannot do so because "[e]ach word, clause, and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous." *Casler*, 2020 IL 125117, ¶ 24. Evidence that a defendant reasonably believed that a person's entry into her dwelling was *unlawful* is insufficient to establish that she reasonably believed that her conduct was *necessary* to prevent or terminate said entry.

¶ 21      Neither the State's evidence nor the testimony offered in Wiggen's defense established that she reasonably believed her conduct was necessary to prevent or terminate Wesley's entry into her house. First, Wiggen's own trial testimony undermines her ability to establish her theory on appeal. The defense of dwelling is a subset of self-defense in that it gives the defendant a legal justification to act under certain circumstances. See *People v. Sawyer*, 115 Ill. 2d 184, 193 (1986) (explaining the similarities and differences between self-defense and defense of dwelling). It differs from self-defense in that the defense of dwelling aims at protecting the sanctity of the defendant's home. *Id.* Either way, however, there needs to be evidence that the defendant had an *actual* belief that the circumstances established the legal justification. *People v. Washington*, 2012 IL 110283, ¶ 35. Wiggen stated that she did not use force against Wesley or make intentional contact with him. Rather, she testified that she tripped and that she grabbed Wesley's jacket to keep from falling. She said that Wesley punched her when she fell. She did not testify that she was attempting either to prevent Wesley's entry or to expel him from the premises. Wiggen's testimony makes it impossible to conclude that she had an actual belief that a use of physical force was necessary to prevent Wesley's entry.

¶ 22      Second, Wesley demonstrated no conduct that suggested that force would have been necessary. He made no attempt to enter the house until a law enforcement officer was present and after Wiggen opened the door to let Renfro in. Wiggen stated that she lost her footing because Wesley rushed in, but the court found that Officer Kosters credibly contradicted that testimony. Kosters testified that Wesley walked past him following Renfro into the house. Contrary to Wiggen's testimony, Kosters did not testify that Wesley used force to rush inside. He also reported that he saw "Wiggen yelling at [Wesley] and then she kind of bull rushed and pushed him." Wesley then fell backwards. Although Renfro lost visual on Wesley and Wiggen for "a brief period of maybe 45 seconds to a minute," her testimony buttresses that of Kosters.

She heard Wesley screaming: "She hit me, she hit me," shortly after he followed her in the house—at about the same time Kosters would have seen Wiggen "bull rush[ ]" Wesley.

¶ 23     We note that the trial court indicated that it rejected the testimony of other witnesses and accepted Kosters' testimony simply because it believed him to be an uninterested, neutral party. Such a cursory assessment of the evidence runs the risk of indiscriminately elevating the testimony of responding officers over that of witnesses whose perception or recollection may be more accurate even though they are interested in the outcome. This understanding of credibility falls short of "the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *Gray*, 2017 IL 120958, ¶ 35. Fortunately, Kosters's testimony is not such that "the record evidence compels [us to conclude] that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280. Our review of the record before us shows that, while parts of his testimony are inconsistent with that of one or more of the participants, other parts are supported. For example, Renfro's partial corroboration of Kosters's account of the events gives greater credibility to said account over Wiggen's account of the same events.

¶ 24     Finally, Kosters' presence makes it difficult for us to conclude that Wiggen reasonably believed force was necessary. Kosters was dispatched in response to the trespass complaint. When Wesley entered the house, Kosters was present and available to remove him from the premise. In addition, when Chief Meglan arrived at the house, he immediately informed Wesley that he was under arrest for possibly violating the order of protection. We do not hold that force is unnecessary merely because a police officer is present at the dwelling. However, faced with the facts of this case, we cannot conclude that Wiggen reasonably believed that force was necessary to prevent or terminate Wesley's entry. Therefore, we do not find that the evidence raised the affirmative defense asserted by Wiggen on appeal.

¶ 25                              B. Ineffective Assistance of Trial Counsel

¶ 26     "A claim alleging ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Veach*, 2017 IL 120649, ¶ 29. " 'To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant.' " *Id.* ¶ 30 (quoting *People v. Domagala*, 2013 IL 113688, ¶ 36). "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377 (2000).

¶ 27     Wiggen argues that her trial counsel was ineffective for failing to present the affirmative defense of defense of a dwelling. However, "[d]ecisions such as what evidence to present, whether to call a certain witness and what theory of defense to pursue are matters of trial strategy." *People v. Morris*, 2013 IL App (1st) 110413, ¶ 74. "Matters of trial strategy are generally immune from claims of ineffective assistance of counsel." *People v. Smith*, 195 Ill. 2d 179, 188 (2000). Moreover, "[t]he decision whether to testify ultimately rests with the defendant." *People v. Averett*, 381 Ill. App. 3d 1001, 1016 (2008) (citing *People v. Campbell*, 208 Ill. 2d 203, 210 (2003)). Because Wiggen chose to testify and because her trial testimony undermined any theory of defense centered on the defense of dwelling, we conclude that she cannot successfully establish either that trial counsel's performance was deficient or that she was prejudiced by counsel's performance. Thus, we hold that she cannot successfully allege

or support a claim of ineffective assistance of counsel.

¶ 28                                    III. CONCLUSION
¶ 29           The judgment of the circuit court of La Salle County is affirmed.

¶ 30           Affirmed.

¶ 31           JUSTICE WRIGHT, specially concurring:
¶ 32           I agree with the majority's conclusion that the State's evidence was sufficient to prove defendant guilty, beyond a reasonable doubt, of the charged offense. I also agree with the majority's analysis and conclusion that ineffective assistance of counsel is not present in this record. However, I note that the State has not argued that defendant forfeited the affirmative defense raised for the first time on appeal. Hence, I do not express any view of the recent case law addressing the forfeiture of affirmative defenses under similar circumstances. Finally, I write separately because I do not share the concerns expressed in paragraph 23 of the majority's opinion.