**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 190326-U

Order filed January 11, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 13th Judicial Circuit, La Salle County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0326 Circuit No. 18-CF-479 |
| | ) | |
| HENRY T. CLEPPER, | ) ) | Honorable Cynthia M. Raccuglia, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice O'Brien and Justice McDade concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defense counsel did not provide ineffective assistance by failing to argue self-defense or request a self-defense jury instruction. The court did not commit reversible plain error by allowing a jury instruction regarding resisting arrest.

¶ 2    Defendant, Henry T. Clepper, appeals his conviction for aggravated battery of a peace officer. Defendant argues that counsel provided ineffective assistance because he failed to argue self-defense and request a self-defense jury instruction. He further argues that the La Salle County circuit court erred by giving a jury instruction regarding resisting arrest. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        The State charged defendant with aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4) (West 2018)). The charge stemmed from an incident between defendant and Jeremiah Brown, a Peru police officer, who was initially attempting to escort defendant out of a homeless shelter. The matter proceeded to a jury trial.

¶ 5        Pat Davis testified that she worked as the site manager for the homeless shelter. The shelter's policy required that individuals who had a blood alcohol content over 0.08 leave the shelter. On the relevant night, due to defendant's behavior, Davis requested that defendant submit to a Breathalyzer test. She repeated the test several times because defendant did not blow into it correctly. Defendant then stated he would leave. Defendant, while muttering, walked to his bunk and started a confrontation with a shelter volunteer. Davis did not hear the confrontation because she was calling the police.

¶ 6        Davis called the police because she needed help escorting defendant out and felt "that there would be a problem." Officers arrived within minutes. While waiting for the officers, defendant yelled at a volunteer and another client intervened.

¶ 7        After officers arrived, they informed defendant they were there to escort him out. Defendant began packing his belongings but repeatedly stopped and at times approached and spoke to the officers. Officers directed defendant to leave, and "the next thing [Davis] kn[e]w" one officer was on the floor and defendant was on top of him. Defendant fought with the officer and Davis saw defendant's hands around the officer's neck.

¶ 8        Brown testified that he responded to a call from the shelter. When he arrived, two or three females greeted him. They "flung the door open and sa[id] hurry, they're actively fighting." As Brown entered, he saw "two to three people that were like being separated. And there was just a

2

lot of screaming, a lot of cursing." Brown wanted to separate everyone to determine what happened and to deescalate the situation.

¶ 9    Brown determined that defendant "was very loud, aggressive, and very intoxicated." He could tell defendant was intoxicated because of his body language and he smelled a strong odor of alcohol on defendant's breath. Further, "there was no reasoning with [defendant] initially when [Brown] came into contact with him." Brown initially asked defendant to speak with him outside. Defendant responded that he was taking his belongings and leaving, and Brown said, "Let's pack your stuff. Let's go." Brown's goal at that time was to separate defendant, but defendant refused and indicated he was leaving. Defendant stated that he was the victim and that Rufus Jones had assaulted him.

¶ 10   Brown suggested that defendant gather his belongings and then escorted Jones to the other side of the shelter to speak with him. While speaking with Jones, defendant approached Brown, and Brown told defendant to pack his belongings and go. Defendant began packing his belongings. Brown then spoke with Davis who made it clear that she wanted defendant to leave and defendant was the primary aggressor. As Brown was speaking with Davis, he heard yelling and saw defendant taking an aggressive stance toward Officer David Damron.

¶ 11   Brown then approached defendant and told him "enough is enough. We're going." Brown picked up defendant's suitcase and put his right hand on defendant's left elbow. Defendant "proceeded to throw his left elbow at—up at—towards [Brown] in a very aggressive stance and he continued to scream and be very belligerent with [Brown]." When Brown "started to grab [defendant], [defendant] then proceeded to go chest to chest with [Brown] and bumped [him] in the chest twice going face to face with [Brown] in a very aggressive stance." Brown stated he then "actually had to grab [defendant] and I said all right, enough is enough. I'm escorting you out at

3

this point." Brown had already requested three times that defendant leave willingly, and he refused. Brown "felt it was necessary to de-escalate the situation *** by at least getting [defendant] outside." Brown grabbed part of defendant's arm and hooded sweatshirt and started to drag him outside. Defendant tried "to push away" from Brown; they were "driven in to a series of kitchen tables *** and then the fight was on."

¶ 12        Defendant "square[d] off at" Brown again and threw his left arm back at Brown. Defendant then grabbed Brown by the throat. Brown attempted "a hip toss" to get defendant off and they bumped into a partition. Defendant landed on top of Brown and grabbed him by the throat. When Brown attempted to sit up, defendant grabbed him "by the throat and choke slam[med] [Brown] back down to the ground." Brown could not breathe when defendant's hand was around his neck. Damron deployed his taser, which allowed Brown to get up. Brown's goal was to take defendant into custody, and after a few minutes, he was able to do so. Brown stated that after taking defendant to the police station, defendant told him "[t]hat he kicked [Brown's] ass."

¶ 13        The State admitted into evidence and published to the jury the surveillance video from the shelter, which shows the altercation between defendant and Brown. While the video does not contain audio, it largely corroborated Brown's testimony regarding his interaction with defendant.

¶ 14        Damron testified that he responded to a call from the shelter along with Brown. After entering the shelter, he determined "two people were being more belligerent than the rest." Damron identified one of the belligerent individuals as defendant. Brown spoke with defendant while Damron spoke with the other individual; however, defendant interrupted him. Eventually, Damron spoke with defendant near his belongings. Damron characterized the conversation as aggressive. Brown approached defendant and said defendant needed to leave. Brown grabbed defendant by the arm to escort him out. Defendant "pulled away and took an aggressive stance toward [Brown]."

4

Damron elaborated that defendant "squared up in to like more of a fighting stance so that he would be ready to fight [Brown]."

¶ 15    Brown grabbed defendant again and they began actively fighting. Damron agreed that defendant was not leaving willingly so they needed to remove him. Defendant became "aggressive towards [Damron and Brown] because [they] were trying to remove him." Ultimately, defendant "was *** on top of Officer Brown and had his hands on his neck area holding him down while Officer Brown was trying to get out from underneath him." Damron tased defendant. Eventually, they took defendant into custody.

¶ 16    During cross-examination, defense counsel elicited testimony from Damron that the first person to make physical contact was Brown to defendant.

¶ 17    After the State rested, defendant moved for a directed verdict. Counsel argued "that the officer was the aggressor in this matter." The court denied the motion.

¶ 18    During the jury instruction conference, defense counsel objected to the State's proposed jury instruction that instructed a person is not authorized to use force to resist arrest. The State argued that defense counsel elicited statements and made arguments in support of the motion for directed verdict that Brown was the initial aggressor and while it was not to the point of alleging self-defense, the jury should be aware that defendant was not authorized to resist. The court allowed the instruction.

¶ 19    During closing argument, defense counsel argued Brown made the initial physical contact with defendant, which led to the altercation. He further argued defendant did not make any contact with Brown until Brown grabbed him.

¶ 20    The jury found defendant guilty. The court sentenced him to 5½ years' imprisonment. Defendant appeals.

5

¶ 21                                        II. ANALYSIS

¶ 22                               A. Ineffective Assistance of Counsel

¶ 23        Defendant argues that his counsel provided ineffective assistance by failing to argue self-defense and present a jury instruction regarding self-defense. We note that defendant addressed these two issues separately; however, he appears to argue the lack of the jury instruction was the prejudice that resulted from counsel's failure to raise the defense. As these are closely related, we address them together.

¶ 24        "[T]o prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial." *People v. Horton*, 143 Ill. 2d 11, 23 (1991). "To show actual prejudice, defendant must establish that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). "The failure to satisfy either the deficiency prong or the prejudice prong of the *Strickland* test precludes a finding of ineffective assistance of counsel." *People v. Enis*, 194 Ill. 2d 361, 377, (2000). "[I]f [an] ineffective-assistance claim can be disposed of on the ground that the defendant did not suffer prejudice, a court need not decide whether counsel's performance was constitutionally deficient." *People v. Griffin*, 178 Ill. 2d 65, 74 (1997). A decision as to what theory of defense to present is a matter of trial strategy, which is generally immune from a claim of ineffective assistance of counsel. *People v. Wiggen*, 2021 IL App (3d) 180486, ¶ 27.

¶ 25        Here, defendant argues that counsel provided ineffective assistance by failing to pursue self-defense because "Brown's sudden aggression constituted excessive force" in this "non-arrest

6

situation." But even if defendant could avoid the general rule that matters of trial strategy, such as which theory of defense to present, are immune from ineffective assistance claims, his argument still fails because he cannot show prejudice from counsel's failure to raise self-defense.

¶ 26    If the State negates any element of self-defense, the claim of self-defense fails. See *People v. Lee*, 213 Ill. 2d 218, 225 (2004). The threat of unlawful force against defendant is one element of self-defense. *Id.* Here, there was no threat of unlawful force against defendant. Specifically, the police were justified in conducting an investigative detention based upon the indications that a fight had occurred just prior to the officers' arrival, indications of trespass due to defendant's failure to exit the shelter, despite shelter staff seeking his removal and Brown telling defendant to leave multiple times, and indications of disorderly conduct based upon defendant's apparent intoxication, confrontation with a volunteer, indications of a fight, and his aggressive and belligerent behavior. See *People v. Timmsen*, 2016 IL 118181, ¶ 9 (providing that pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), an officer may conduct a brief, investigatory stop of a person if the officer has a reasonable, articulable suspicion of criminal activity); see, *e.g.*, 720 ILCS 5/21-3(a)(1), (a)(3), 26-1(a)(1) (West 2018). Additionally, the officers were, at least initially, acting in a community caretaking function by attempting to keep the peace while escorting an unwelcome individual—defendant—from the premises. See *People v. McDonough*, 239 Ill. 2d 260, 269 (2010) (noting that the community caretaking doctrine is utilized to uphold seizures when police are performing some function other than investigating a crime). When an officer has authority to conduct a detention, he has authority to use the force necessary to effectuate that detention. See *People v. Roberts*, 96 Ill. App. 3d 930, 934 (1981) (noting it would be anomalous to provide an officer authority to detain but "deny him the use of force necessary to effectuate that detention"). Further, our review of the record, including the video, does not reveal any excessive force by

7

Brown. See, *e.g.*, *People v. Sims*, 374 Ill. App. 3d 427, 432 (2007) (stating that an officer's use of excessive force invokes the right to self-defense). Since defendant could not establish a threat of unlawful force against him by Brown, there is no reasonable probability that the outcome of the proceedings would have been different had counsel argued self-defense. Therefore, defendant cannot establish prejudice from counsel's failure to raise self-defense and his claim of ineffective assistance of counsel fails.

¶ 27        To the extent defendant was attempting to raise a separate issue of ineffective assistance based upon the failure to request a jury instruction on self-defense, that claim also fails. As previously set forth, the claim of self-defense was not meritorious. *Supra* ¶ 26. Although it is arguable that defendant could have obtained such an instruction if requested (see *Sims*, 374 Ill. App. 3d at 432 (providing that a defendant is entitled to a jury instruction on his theory of the case if there is some evidence supporting it)), a decision not to pursue the instruction when the defense was ultimately not meritorious would be a matter of trial strategy, which is generally immune from claims of ineffective assistance of counsel. See *Wiggen*, 2021 IL App (3d) 180486, ¶ 27. We see no reason to depart from that general principle in this instance.

¶ 28                                    B. Jury Instruction

¶ 29        Defendant argues that the court erred by permitting a jury instruction regarding resisting arrest when he was not under arrest at the time of the battery, and he was not charged with resisting arrest. Defendant acknowledges that although counsel objected to the instruction, counsel failed to preserve the issue by reiterating the objection in a posttrial motion. As such, defendant requests plain-error review and argues that it was reversible error to give the instruction because the evidence was closely balanced.

8

¶ 30    The plain-error doctrine allows a forfeited error to be reviewed when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant." *People v. Belknap*, 2014 IL 117094, ¶ 48. Typically, the first step in applying the plain-error doctrine is to determine whether a clear or obvious error occurred. *People v. Sebby*, 2017 IL 119445, ¶ 49. However, even assuming error, the evidence was not closely balanced and therefore the alleged error is not reversible plain error. The uncontradicted trial testimony and video evidence clearly establish the aggravated battery and, as set forth above, self-defense was not a viable defense.

¶ 31                                    III. CONCLUSION

¶ 32    For the foregoing reasons, we affirm the judgment of the circuit court of La Salle County.

¶ 33    Affirmed.