2023 IL App (1st) 211453-U

No. 1-21-1453

Order filed August 16, 2023

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 1948 |
| | ) | |
| ALEC TARASIUK, | ) | Honorable |
| | ) | Samuel J. Betar III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE D.B. WALKER delivered the judgment of the court.
Presiding Justice McBride and Justice Reyes concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's finding that defendant was "not not guilty" of first degree murder following a discharge hearing is affirmed. Defendant failed to establish that (1) his actions were justified in self-defense or constituted second degree murder based on imperfect self-defense, or (2) his counsel was ineffective for allegedly conceding defendant's guilt and failing to ask the court to acquit or consider second degree murder.

¶ 2     Following a discharge hearing, defendant Alec Tarasiuk was found "not not guilty" of first degree murder and remanded to the Department of Human Services (DHS) for inpatient treatment

for five years.[1] On appeal, defendant contends that (1) the circuit court should have acquitted him for acting in self-defense or, alternatively, found him "not not guilty" of second degree murder, and (2) counsel was ineffective for allegedly conceding defendant's guilt and failing to ask the court to acquit or consider second degree murder. We affirm.

¶ 3    Defendant was charged by indictment with multiple counts of first degree murder after allegedly shooting his father Walter Tarasiuk on January 10, 2018.[2] Defendant did not file an answer to discovery. Defense counsel requested a behavioral clinical exam to determine defendant's fitness to stand trial.

¶ 4    At a fitness hearing on December 12, 2019, forensic psychiatrist Dr. Sarah Anderson testified that she examined defendant on October 29, 2019, and concluded that he was unfit to stand trial. Defendant experienced delusional ideations regarding the incident, the victim, and the proceedings, which precluded him from assisting counsel in a rational manner. There was a substantial probability that defendant would be restored to fitness within one year with appropriate treatment. The court found defendant unfit to stand trial and remanded him to DHS for inpatient treatment.[3]

¶ 5    On November 4, 2021, the court held a discharge hearing.

¶ 6    At the discharge hearing, the State published People's Exhibits 1-A and 1-B, which were recordings of calls to a 911 center on January 10, 2018, shortly after 11 a.m. The recordings are

---

[1] Defendant was charged with three counts of first degree murder under section 9-1(a)(1) of the Criminal Code of 2012 (Code) and three counts of first degree murder under section 9-1(a)(2) of the Code. See 720 ILCS 5/9-1(a)(1), 9-1(a)(2) (West Supp. 2017). The circuit court's verbal pronouncement and written order finding defendant "not not guilty" of first degree murder did not specify a count or statutory subsection, but the case summary reflects that defendant was found "not not guilty" on all six counts.

[2] As the decedent shares the same last name as defendant, we will refer to him by his first name.

[3] During a hearing on September 28, 2021, defense counsel mentioned that defendant was also found unfit following another fitness hearing in December 2020. The record on appeal, however, does not contain a report of proceedings, a written order, or other documentation of another fitness hearing.

included in the record on appeal and have been reviewed by this court. Exhibit 1-A, in relevant part, includes an individual stating, "my dad said he was gonna kill me, I shot him," and providing an address for a residence on Ash Road. Exhibit 1-B includes an individual providing the same address on Ash and stating, "my dad said he was gonna kill me, I shot him, please come."

¶ 7    The State entered a stipulation between the parties that Hoffman Estates police officer Michael Barber would have testified that he was dispatched to a residence on Ash Road on January 10, 2018, after the 911 calls. Barber parked near the residence. A portion of footage from a recording device in Barber's vehicle was published, is included in the record on appeal, and has been reviewed by this court.

¶ 8    In the footage, someone requests over a loud speaker that anyone inside the residence exit. An individual wearing a white shirt approaches the vehicle with his hands raised. According to the stipulation, Barber would have identified defendant as the individual wearing the white shirt and testified that defendant was then detained.

¶ 9    Retired Hoffman Estates police sergeant Alvaro Fernandez testified that he and his then-partner Detective Anthony Tenuto went to the residence after hearing a report that someone had been shot. When they arrived, defendant, whom Fernandez identified in court, was already detained by other officers. Inside the residence, Fernandez observed a revolver on a coffee table in defendant's bedroom. In the master bedroom, he observed Walter lying on a loveseat, wearing a gaming headset with a controller between his legs. There was an "entry wound" to his right cheek. No firearms were recovered from Walter's bedroom.

¶ 10    At the police station, Tenuto administered defendant warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and defendant agreed to speak. Fernandez and Tenuto interviewed

defendant; the interview was recorded, and portions were published during Fernandez' testimony about the interview.[4]

¶ 11     Fernandez testified that, in the interview, defendant stated that he and Walter argued earlier that day. Walter questioned defendant's self-worth and said he would kill him. Defendant and Walter retreated to separate bedrooms. Walter played a video game, and defendant heard him yelling, "I'll kill you" and "[t]his will be you" while "chainsaw chopping" someone in the game. Defendant felt that the statements were directed at him, so he went to the garage where a revolver and semiautomatic firearm were stored. Defendant chose the revolver because it had one round of ammunition, whereas the semiautomatic firearm was unloaded. Defendant concealed the revolver and returned to his bedroom. Defendant then went to the master bedroom, "popped out," aimed the firearm at Walter, and discharged it. Defendant knew Walter was dead because he was "leaking" from his nose and face. Defendant turned off Walter's television and video game, returned to his bedroom, and called the police.

¶ 12     On cross-examination, Fernandez testified that, before interviewing defendant, he spoke with Michelle Malitello, Walter's girlfriend, and learned that defendant previously resided in Malitello's home with her, Walter, and Malitello's two daughters. Malitello expressed that defendant may have been sick or had schizophrenia. Six months prior to the shooting, according to Malitello, defendant resided with his mother and sister and threatened to kill them, so he was admitted to a psychiatric hospital. After his release, defendant resided with Walter and refused to continue his mental health treatment. On the morning of the shooting, Malitello had a phone

---

[4] Portions of the video were admitted as evidence and published to the circuit court. This court's review of the video confirms Fernandez's summary of the interview.

conversation with Walter around 11 a.m., and he stated that he was playing a video game. Nothing about the phone conversation led her to believe that anything was out of the ordinary.

¶ 13    Fernandez further testified that defendant called 911 and admitted that he shot Walter. At the scene, defendant told other officers that Walter threatened him, so he shot Walter. During the interview with Fernandez, defendant stated that Walter was "mad at the world" and thrived on verbal abuse. Walter called defendant a "b****," talked about his self-worth, and threatened to kill him, and defendant feared that Walter would harm him. Defendant said he did not want to argue, so he walked away. Defendant thought Walter wanted him to hear the statements Walter made while he played the game because Walter said them so loud. Defendant thought Walter would kill him after "building it up and making it suspenseful," and he knew that Walter stored firearms inside the garage and residence. Before defendant shot Walter, Walter looked at him in the doorway and smiled. Defendant repeatedly stated that he shot Walter in self-defense because he believed Walter would kill him.

¶ 14    On redirect examination, Fernandez testified that defendant said that he knew he could leave the residence, though defendant did not know where he would go. Defendant did not report seeing Walter with a firearm or that defendant was threatened with a firearm or any weapon that day. Defendant shot Walter from several feet away.

¶ 15    The State entered several stipulations between the parties.

¶ 16    First, Malitello would have testified that when she spoke with Walter on the morning of the shooting, his mood was happy and upbeat. According to Malitello, Walter stored two firearms in the garage but stored the ammunition separately.

¶ 17    Second, Dr. Benjamin J. Soriano, assistant medical examiner for the Cook County Medical Examiner's Office, concluded that Walter's cause of death was a gunshot wound to the head, and the manner of death was homicide. A projectile was recovered from Walter's head.

¶ 18    Third, Amanda Darnell, a forensic scientist with the Illinois State Police, would have testified that she tested the recovered revolver and the spent bullet recovered by the medical examiner, and determined that the spent bullet was discharged from the revolver.

¶ 19    After the State rested, the defense entered a stipulation that defendant was admitted to Chester Mental Health Center (Chester) on January 15, 2020, and remained there until the date of the discharge hearing. The court ordered an updated behavioral clinical examination on April 22, 2021. On July 26, 2021, Dr. Mandi Adydan attempted to evaluate defendant's fitness, but defendant refused to participate. The defense entered a further stipulation that a psychiatrist with the Cook County Department of Corrections would testify that defendant's psychiatric symptoms "improved significantly" due to court-ordered involuntary medication, and deteriorated when he was noncompliant with medication.

¶ 20    Dr. Muhammad Choudhry, a psychiatrist at Chester, testified that defendant was diagnosed with schizophrenia with symptoms of paranoia. Defendant had hallucinations, distorted thinking, and impaired rational thinking, insight, and judgment. Defendant presented with symptoms of social isolation, neglecting personal hygiene, being oppositional or defiant, and aggression. Defendant did not willingly take medication, and Chester obtained court orders to involuntarily medicate him. The medication helped minimize defendant's aggressive behavior but did not stabilize him due to his severe schizophrenia. Defendant remained unfit and needed inpatient care.

¶ 21    On cross-examination, Dr. Choudhry testified that he discussed the roles of courtroom personnel with defendant, who refused to indicate whether he understood. Therefore, Dr.

Choudhry assumed that defendant did not understand. Defendant also did not demonstrate an understanding of the charges. Dr. Choudhry opined it was unlikely that defendant would become fit in the future. On redirect examination, Dr. Choudhry stated that it would be difficult for defendant to assist counsel in creating a defense, so defendant would be unable to participate.

¶ 22 During closing arguments, defense counsel stated, in relevant part, that defendant "reasonably believed in his mind" that his life was endangered based on Walter's statements. Defendant "acted upon that belief" and shot Walter in self-defense. Counsel added

> "We do believe that [defendant's] mental health situation right now is such that he cannot appreciate the severity of the charges before this court, cannot cooperate and assist defense counsel in defending him at a trial, and we agree that he should be found not not guilty."

¶ 23 The court found defendant "not not guilty" of first degree murder and unfit to stand trial, stating that it considered the testimony, evidence, and arguments of counsel. The court remanded defendant to DHS for five years for a continuation of inpatient treatment. The record does not show that defendant filed a post-hearing motion.

¶ 24 On appeal, defendant first contends that he should have been acquitted of first degree murder because he proved that he shot Walter in self-defense, or, alternatively, he should have been found "not not guilty" of second degree murder based on "imperfect self-defense."

¶ 25 Defendant appeals from the circuit court's ruling following a discharge hearing. A discharge hearing is civil in nature and not a criminal prosecution. *People v. Waid*, 221 Ill. 2d 464, 470-72 (2006). The purpose of the hearing is to determine whether the State has sufficient evidence to prove a defendant who has been found unfit to stand trial guilty of the charged crime. *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 14. As with criminal prosecutions, the standard of proof at a

discharge hearing requires the State to establish a defendant's guilt beyond a reasonable doubt. *People v. Orengo*, 2012 IL App (1st) 111071, ¶ 31.

¶ 26 If the evidence is insufficient, the defendant must be acquitted; however, if the evidence is sufficient, no conviction results, but the defendant is found "not not guilty." *In re D.L.H., Jr.*, 2015 IL 117341, ¶ 14. Accordingly, when a defendant challenges the sufficiency of the evidence on review, the reviewing court must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 32 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

¶ 27 As charged, a person commits first degree murder when he "kills an individual without lawful justification" and "intends to kill or do great bodily harm to that individual *** or knows that such acts will cause death to that individual," or "knows that such acts create a strong probability of death or great bodily harm to that individual." 720 ILCS 5/9-1(a)(1), 9-1(a)(2) (West Supp. 2017).

¶ 28 Self-defense is an affirmative defense and a lawful justification for murder, *i.e.*, for the use of deadly force against another. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995). By arguing self-defense, a defendant admits he committed the act underlying the murder charge, but claims he was lawfully justified in doing so. See, *e.g.*, *People v. Chatman*, 381 Ill. App. 3d 890, 897 (2008). To prevail on a claim of self-defense, defendant must establish that (1) unlawful force was threatened against him, (2) he was not the aggressor, (3) the danger of harm was imminent, (4) the force used was necessary, (5) he actually and subjectively believed a danger existed that required the use of force applied, and (6) his beliefs were objectively reasonable. *People v. Frazier*, 2019 IL App (1st) 172250, ¶ 40. If the State negates any of the six elements, defendant's self-defense claim fails. *Id.*

¶ 29    As an initial matter, the State argues that defendant forfeited a claim of self-defense because he failed to raise the affirmative defense in the circuit court. "A defendant forfeits an affirmative defense by failing to make it in the trial court." *People v. Shepherd*, 2020 IL App (1st) 172706, ¶ 17 (citing *People v. Bardsley*, 2017 IL App (2d) 150209, ¶ 17 ("the mere presence in the State's evidence of facts sufficient to permit a defendant to raise a defense is not by itself sufficient to trigger the requirement that the State disprove the defense")). Here, however, the evidence showed defendant repeatedly told Fernandez and other officers that he acted in self-defense, and defense counsel argued self-defense in closing. Counsel argued, without objection by the State, that defendant shot Walter in what he believed to be self-defense because he "reasonably believed in his mind" that his life was in danger. Neither *Shepherd* nor *Bardsley*, relied on by the State, "cited any principle of law requiring a criminal defendant to expressly plead an affirmative defense," and a defendant may raise an affirmative defense by the pleadings or the evidence. *People v. Wiggen*, 2021 IL App (3d) 180486, ¶ 17.

¶ 30    Regardless, viewing the evidence in the light most favorable to the State as we must, the evidence was insufficient to establish that defendant killed Walter in self-defense.

¶ 31    The court heard testimony that defendant told Fernandez that prior to the shooting, defendant and Walter argued, and Walter threatened to kill defendant. Defendant and Walter retreated to separate bedrooms. Walter sat on a loveseat in his bedroom and played a video game while yelling, "[t]his will be you," and "I'm going to kill you" as he "chainsaw chopp[ed]" someone in the game. Defendant perceived those statements to be directed at him, so he went into the garage, obtained a loaded firearm, concealed it, and returned with it to his bedroom. Defendant then went to Walter's bedroom doorway, "popped out," and shot Walter. A rational trier of fact

could reasonably conclude that defendant knowingly shot Walter, *i.e.*, that defendant was "not not guilty" of first degree murder.

¶ 32    The evidence was insufficient to support a finding of self-defense. There was no evidence that Walter threatened defendant physically or with a weapon in that moment or previously, and no firearms were recovered from Walter's bedroom. Thus, the evidence does not show that, at the time of the shooting, defendant was threatened with force or in danger of imminent harm, let alone that his use of deadly force was warranted. Defendant was the aggressor: he went to Walter's bedroom and shot Walter as he sat on the loveseat playing a video game. To maintain a claim for self-defense, a defendant has a duty to not become an aggressor. *People v. De Oca*, 238 Ill. App. 3d 362, 367 (1992).

¶ 33    While defendant told Fernandez that he believed that Walter's verbal comments were directed at him, verbal threats of personal injury or death are insufficient to justify the use of deadly force, especially when the victim has not acted upon them. *People v. Felella*, 131 Ill. 2d 525, 534 (1989); see also *People v. Ranola*, 153 Ill. App. 3d 92, 99 (1987) ("Threats or words do not justify the use of force."). Accordingly, we find that defendant has failed to establish the elements of self-defense to justify his use of deadly force, and the State's evidence was sufficient to find defendant "not not guilty" of first degree murder.

¶ 34    For the same reason, defendant's alternative argument that he should have been found "not not guilty" of second degree murder because he presented evidence of a mitigating factor, namely, an unreasonable belief in the need for self-defense, fails.

¶ 35    Second degree murder is a lesser mitigated offense of first degree murder. *Jeffries*, 164 Ill. 2d at 122. When a defendant commits first degree murder but establishes by a preponderance of the evidence the existence of a mitigating factor at the time of the killing, such as an unreasonable

belief in the need for self-defense, the offense is second degree murder. 720 ILCS 5/9-2(a)(2), 9-2(c) (West 2018). After the State has proven beyond a reasonable doubt every element of first degree murder, the burden shifts to the defendant to establish a mitigating factor by a preponderance of the evidence. 720 ILCS 5/9-2(c) (West 2018).

¶ 36 When a defendant asserts a mitigating factor, the reviewing court must consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present.' " *People v. Rutigliano,* 2020 IL App (1st) 171729, ¶ 80 (quoting *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996)). The trier of fact must reduce an offense from first to second degree murder if the defense proves the existence of at least one mitigating factor by a preponderance of the evidence. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 55.

¶ 37 To be found guilty of second degree murder based on the mitigating factor of an unreasonable belief in self-defense or "imperfect self-defense," a defendant must establish by a preponderance of the evidence each of the first five elements of self-defense. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 149. "[I]mperfect self-defense" occurs "when there is sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *Jeffries*, 164 Ill. 2d at 113. Whether a defendant's actions are justified by an unreasonable belief in the need for self-defense is a question of fact for the trier of fact to resolve. *People v. Washington*, 2012 IL 110283, ¶ 60.

¶ 38 As discussed, there was no evidence that Walter posed any threat to defendant after defendant retreated to his bedroom, and, though defendant perceived Walter's statements to be directed at him, they were insufficient to justify deadly force. *Felella*, 131 Ill. 2d at 534 ("The long-standing rule is that mere threats of personal injury or death do not justify taking the life of

the person making the threats when he is doing nothing to put them into execution."). Based on the record, a rational trier of fact could have found that defendant was the aggressor, no unlawful force was used against him, and he was not in danger of imminent harm when he discharged the firearm at Walter, who was unarmed. Defendant's claim that the evidence shows he acted under the unreasonable belief in the need for self-defense supporting a conviction of second degree murder fails. See *Castellano*, 2015 IL App (1st) 133874, ¶ 160 (second degree murder cannot be found where the defendant fails to prove one of the first five elements of self-defense).

¶ 39     Defendant next argues that counsel was ineffective for allegedly conceding that defendant was "not not guilty" of first degree murder and failing to ask the circuit court to acquit him based on self-defense or consider second degree murder based on imperfect self-defense as a lesser mitigated offense, citing *Strickland v. Washington*, 466 U.S. 668, 685 (1984). Defendant also contends that counsel was ineffective for failing to subject the State's case to meaningful adversarial testing, citing *United States v. Cronic*, 466 U.S. 648, 659 (1984).

¶ 40     Every criminal defendant has a constitutional right to effective assistance of counsel. *Strickland*, 466 U.S. at 685. To prevail on a claim of ineffective assistance pursuant to *Strickland*, a defendant must establish that (1) "counsel's performance was deficient," and (2) counsel's "deficient performance prejudiced the defense." *Id.* at 687. To establish deficient performance, a defendant must "overcome the strong presumption that the challenged action or inaction of counsel was the product of sound trial strategy and not of incompetence." *People v. Coleman*, 2023 IL App (1st) 210263, ¶ 27. To establish prejudice, a defendant must demonstrate a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

¶ 41    *Cronic* establishes that there are circumstances, such as where defense counsel fails to subject the prosecution's case to "meaningful adversarial testing," that are so likely to prejudice a defendant that prejudice will be presumed. *Cronic*, 466 U.S. at 659. However, to prevail under *Cronic*, counsel must fail to oppose the State's case throughout the entire proceeding. *People v. Cherry*, 2016 IL 118728, ¶ 26. Here, defense counsel subjected the State's case to meaningful adversarial testing by eliciting testimony during cross-examinations regarding defendant's self-defense theory and arguing defendant's self-defense theory during closing argument. Accordingly, defendant's claim of ineffective assistance of counsel under *Cronic* fails, and we must analyze defendant's claim under *Strickland*.

¶ 42    We may dispose of an ineffective assistance of counsel claim based on lack of sufficient prejudice alone (*People v. Johnson*, 2021 IL 126291, ¶ 53), and do so here. To demonstrate prejudice, it is not enough for defendant to show that counsel's alleged error had some conceivable effect on the court's finding. *Strickland*, 466 U.S. at 693. Rather, defendant must demonstrate actual prejudice from counsel's error, not mere speculation that he was prejudiced. *People v. Bew*, 228 Ill. 2d 122, 135 (2008). He must demonstrate "there is a reasonable probability that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt." *Johnson*, 2021 IL 126291, ¶ 54. Defendant does not demonstrate such a reasonable probability here.

¶ 43    The errors raised by defendant regarding trial counsel's representation do not demonstrate that the trial outcome would have been more favorable to defendant absent those errors. Even had counsel not allegedly conceded defendant was "not not guilty" of some unspecified offense and had expressly requested that the court acquit based on self-defense or consider second degree murder, it is mere speculation that the outcome of the trial could have been different. The evidence would still have established that, as discussed, Walter was sitting in his room playing a video game

when defendant came to the room and shot him. The evidence would still show that defendant was the aggressor and not in imminent danger of harm when he shot Walter. Although Walter yelled threats as he played the video game, there was no evidence that he physically threatened defendant or brandished a weapon. The evidence establishes the elements of first degree murder and does not support either self-defense or second degree murder premised on an unreasonable belief in self-defense. Thus, defendant cannot demonstrate that, but for counsel's alleged concession and failure to expressly request the court to acquit him or consider second degree murder, there is a reasonable probability that the circuit court would have acquitted him of first degree murder or found him "not not guilty" of second degree murder. Defendant has not demonstrated prejudice under *Strickland*, and his ineffective assistance of counsel claim fails.

¶ 44    In sum, the evidence was sufficient to prove defendant "not not guilty" of first degree murder, and defendant's ineffective assistance of counsel claim fails for lack of prejudice. We therefore affirm the court's finding of "not not guilty" of first degree murder.

¶ 45    Affirmed.